NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11687


COMMONWEALTH  vs.  DESHAWN CHAPPELL.



Suffolk.     September 11, 2015. - November 23, 2015.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.


Homicide.  Deoxyribonucleic Acid.  Constitutional Law,
    Confrontation of witnesses, Fair trial.  Evidence, Expert
    opinion, Consciousness of guilt, State of mind, Insanity.
    Witness, Expert.  Insanity.  Mental Health.  Practice,
    Criminal, Capital case, State of mind, Confrontation of
    witnesses, Instructions to jury.



Indictment found and returned in the Superior Court
Department on March 24, 2011.

The case was tried before by Jeffrey A. Locke, J.


Stephen Neyman for the defendant.
Matthew T. Sears, Assistant District Attorney (Edmund J.
Zabin, Assistant District Attorney, with him) for the
Commonwealth.


BOTSFORD, J.  On January 20, 2011, Stephanie Moulton, a

residential counsellor at a mental health facility in Revere,

was killed while she was at work.  The defendant, a resident of

the facility, was charged with her murder.  Principally at issue

at the defendant's subsequent jury trial was his mental state at the time of the killing; the defendant presented a defense of lack of criminal responsibility. On October 28, 2013, the jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation.

In his appeal from the conviction, the defendant argues that the trial judge erred by (1) permitting the Commonwealth to present evidence concerning deoxyribonucleic acid (DNA) testing through an expert witness who had not performed the DNA testing herself; (2) impermissibly limiting the direct examination of the defendant's primary mental health expert witness; (3) providing the jury with an inadequate instruction regarding the consequences of a verdict of not guilty by reason of lack of criminal responsibility; and (4) failing to limit the jury's consideration of evidence of consciousness of guilt solely to the issue of the defendant's mental state at the time the crime was committed. He also requests relief under G. L. c. 278, § 33E. We affirm the defendant's conviction, and after a thorough review of the record, we decline to grant relief pursuant to G. L. c. 278, § 33E.

1. Background.[1] a. The offense. We summarize the facts the jury could have found. Prior to January, 2011, the

_____

[1] We summarize here the evidence presented at trial concerning the killing of the victim and the defendant's

defendant was a resident of Perkins House, a moderate-intensity, residential mental health facility in the Charlestown section of Boston.[2]  Following an altercation between the defendant and another resident at that facility, the defendant was transferred temporarily to a respite program and, on January 3, 2011, he moved to Seagull House, a low-intensity group home in Revere for adults with mental illness.[3]  Seagull House staff helped residents to obtain basic social skills and skills required for residents eventually to be able to live on their own.  Seagull House was a "closed house," meaning that, between the hours of 9 $\underline{\text{A}}$.$\underline{\text{M}}$. and 3 $\underline{\text{P}}$.$\underline{\text{M}}$., residents were not allowed to stay inside the facility but were expected to go to jobs or attend mental health group programs in the community.

On January 20, 2011, despite the closed house policy, the defendant remained at Seagull House past 9 $\underline{\text{A}}$.$\underline{\text{M}}$. because he was scheduled to have a meeting at 1 $\underline{\text{P}}$.$\underline{\text{M}}$. with his "team," a group that included the victim and her supervisor, Colette

---

criminal responsibility, reserving discussion of other evidence to our consideration of the legal issues raised.

[2] Perkins House is a residential mental health facility operated by the North Suffolk Mental Health Association (North Suffolk), a nonprofit organization which contracts with the Department of Mental Health to provide mental health services to clients of the department.

[3] Seagull House is another residential mental health facility operated by North Suffolk.

Deneumostier.[4]  Deneumostier arrived at Seagull House at

approximately 8:30 A.M. on January 20, but left shortly

thereafter to perform work-related errands.  The victim also

arrived around the same time or a little later.  When the

Seagull House staff member who had been in charge of the

facility the previous night left sometime after 9 A.M., the

victim and the defendant were the only two people remaining.  At

approximately 10 A.M., Deneumostier spoke to the victim by

telephone; at no point during that conversation did the victim

report any concerns about the defendant's mental status.

Deneumostier tried to contact the victim by telephone again

several times before she (Deneumostier) returned to Seagull

House at 11:30 A.M., but the calls went unanswered.

When Deneumostier arrived at the facility, she heard the

fire alarm sounding, saw smoke, and telephoned the Revere fire

department or 911.  When fire fighters and police officers

responded, they found no one inside the building, but they did

observe a stove with two jets left on the high setting, one of

which had smoke emanating from it; burnt paper on the kitchen

---

[4] According to Colette Deneumostier, team meetings were typically set up shortly after a resident moved into Seagull House and began participating in its program.  The purpose of the January 20, 2011, meeting of the defendant's team was to make sure the staff and he were "on the same page" and to address "some concerns with [the defendant] cooking at night, not doing his chore[s] all the time, [and] taking other people's food.  And . . . to talk about his goals that were being set up."

floor; and charred debris in one of the bedrooms, including a gray, left boot.  In addition, there was a large amount of blood on the floor in the hallway, which appeared to be a drag mark that continued down the hallway and outside to the parking lot, where a spot of blood and a blood-soaked paper towel were found. Under the bed in the defendant's bedroom police found a crumpled note that stated:

> "Babycake, what ups?  I still want to kick with you when I get something house next year.  Are you down with that? How the kids?  WB if you can.  Can you go somewhere, kick with me, movies, out to eat?"

Below that writing was a message in the victim's handwriting that read:  "Not just because I work here, but for many reasons, this is inappropriate."  Police also recovered from an office located in the lower portion of the building a green notebook that contained the victim's handwriting; at the time it was recovered, the notebook was opened to a page referencing the defendant.

At approximately 12:30 P.M. the same day, the victim's body was found in the parking lot of St. George's Greek Orthodox Church (St. George's) in Lynn.[5]  The victim's pants and underwear were pulled down, and she was wearing one gray boot on her right foot that matched the left boot recovered from Seagull House;

---

[5] The defendant had lived for a short period of time in 2005 or 2006 in Lynn near to St. George's Greek Orthodox Church (St. George's), at a time when his then girl friend lived within walking distance of the church.

her left foot was bare other than a white sock.  The victim's body was covered with a bed sheet that came from the defendant's bedroom at Seagull House.  The victim had sustained sharp force injuries to her neck and blunt impact injuries to her head, torso, and upper extremities, but the cause of death was blood loss attributable to a long slash wound to the neck, which severed the sternocleidomastoid muscle, the jugular veins, and the carotid arteries.

Video surveillance from St. George's dated January 20, 2011, showed a vehicle, identified as belonging to the victim, enter the St. George's parking lot at approximately 11:32 A.M., drive to the area where the victim was later found, and leave the parking lot at approximately 11:34 A.M.  The video recording also showed that, while the vehicle was parked, an individual stepped out of the driver's side, made a path around the rear of the vehicle to the passenger's side, returned to the driver's side, proceeded once more to the passenger's side, and eventually drove away.[6]

Around 1 P.M. on January 20, 2011, the defendant visited a cousin in the Dorchester section of Boston and asked her for some money and a place to stay for a couple of days; he was

_____

[6] A resident of a building near to St. George's testified that at approximately 10 A.M. on January 20, 2011, she saw a man who fit the defendant's description in the parking lot.  The witness saw the man bending over, but a snow bank blocked her view of the man's lower body.

unsuccessful in securing either one.  During the visit, the defendant's cousin saw a brown stain on the defendant's pants and a brownish or red stain on the defendant's sweatshirt, and she noticed that he kept his hands covered with his sleeves. When the defendant left the house, he was seen standing in front of the victim's vehicle, which he later abandoned.  After leaving his cousin's house, the defendant went to a clothing store where he stole a white hooded sweatshirt and a hat, and then traveled by train to Braintree and inquired about an extended-stay room at a hotel.  He then telephoned his grandmother, who lived in the Roxbury section of Boston, and asked if he could come to her house, insisting that he did not kill the victim and that his previous girl friend did,[7] and later traveled by public transportation to the building where his grandmother lived.

Police officers were waiting for the defendant in the lobby of his grandmother's building, his grandmother having informed the police of his impending arrival.  Following some resistance, the defendant was arrested and taken into custody.  Police officers handcuffed the defendant and placed him in a chair in the lobby.  While the defendant was seated, and as a police

---

[7] Prior to the defendant's telephone call, his grandmother had seen the television news regarding the killing of the victim in Revere.  When she spoke to the defendant during his call, she told him that she heard that the television news coverage about the killing in Revere involved him.

officer was administering Miranda warnings to him, the defendant blurted out, "The Chinese kid did it."  The defendant did not otherwise exhibit bizarre or psychotic behavior or appear or sound delusional during the time he was in the lobby.

The defendant was transported to a Boston police station and then to the police station in Revere.  During the trip to Revere, the defendant was quiet and calm, but crying, and when asked if he was all right, he said that people had been chasing him all day with guns and that he was worried for his family.  He was asked if he knew why he was in police custody, and he responded that it was "because of what happened at the house."  Testing of a sample of blood located on fingernail scrapings taken from the defendant's right hand revealed that the sample contained a mixture of DNA from at least two individuals.  The major profile identified matched the defendant, and the victim was included as a potential contributor to the minor profile.

b.  <u>The defendant's mental state and criminal responsibility</u>.  The defendant was thirty at the time of trial in October, 2013.  According to his mother and grandmother, while in high school, the defendant had regularly attended school and church, was outgoing and well-dressed, played sports, and worked at a part-time job.  He graduated from high school around 2002 and worked as a sales person at a clothing store and then as a bar back at a convention center in Boston.  Around

2004, his mother noticed that he no longer cared about his appearance and that he had become withdrawn. The defendant began to have trouble sleeping and would call his mother regularly in the middle of the night, asking why he was hearing voices in his head. He also stopped attending weekly family dinners at his grandmother's house.

The defendant was first hospitalized in 2006, after he informed his mother that he wanted to go to the hospital because he felt that he might hurt someone. His mother took him to the emergency department of Massachusetts General Hospital (MGH),[8] and personnel at MGH kept the defendant for observation for two to three weeks. When he was discharged, he went to live with his grandmother. He was prescribed medication, which he eventually stopped taking because the side effects caused him difficulties with swallowing and speaking, and also caused involuntary tremors. Only months after the first instance, the defendant was again hospitalized at MGH. Around 2006, he was diagnosed with schizophrenia[9] and, in that year, became a client of the Department of Mental Health (department). In 2006 and 2007, the defendant was hospitalized briefly at Whidden Memorial

---

[8] The defendant's mother was employed by Massachusetts General Hospital as an operations associate.

[9] Schizophrenia is a mental illness that is long-standing in duration, and symptoms of the illness include disorganized thoughts and perception, delusions, and auditory and visual hallucinations.

Hospital.  From 2006 to 2009, the defendant lived primarily with his grandmother.  According to his grandmother, the defendant's mental health condition deteriorated during that period, even though he resumed taking medication.  For example, the defendant was hearing voices and he tried to get the voices out of his head by eating large amounts of food and by trying to burn them out.  At one point, he also became too frightened to leave the house.  In 2009, the defendant was hospitalized at MGH for a third time, after which he went to Bridgewater State Hospital (Bridgewater) for three weeks.  Around 2009, the defendant was placed at Perkins House, and in late 2009, he was hospitalized at Arbor Hospital.  The defendant was hospitalized for psychiatric reasons on at least five occasions between 2006 and the day the victim was killed in January, 2011; the final hospitalization ended in December, 2009.

David Thomson, a program coordinator employed by North Suffolk Mental Health Association (North Suffolk), first met the defendant when he was a resident of Perkins House.  Thomson made referrals of the defendant to the Boston Emergency Services Team (BEST)[10] in October, 2009, and in July and September, 2010, because the defendant appeared disorganized and was decompensating on these dates.  The defendant's medical record

---

[10] The Boston Emergency Services Team (BEST) is a team of mental health clinicians who respond to emergency calls to perform crisis evaluations.

at North Suffolk indicated that on the date of the July, 2010, BEST referral, he had an increase in hallucinations, felt paranoid, believed that members of the staff were listening to his conversations, and made verbal outbursts regarding the taking of his powers. That record also reflected that the defendant had a history of traumatic brain injuries, lead poisoning, and substance abuse.

Michael Swinchoski, a licensed mental health counsellor employed by North Suffolk, first met the defendant in 2007. Swinchoski believed the defendant suffered from disorganized schizophrenia, and that he responded to an inner stimulus unprompted by any external circumstances. In December, 2010, and January, 2011, Swinchoski was working with the defendant in an attempt to allow him to live in his own apartment, which Swinchoski thought would help reduce the defendant's level of stress and, thus, ameliorate his symptoms. On January 19, 2011, one day before the killing, Dr. Daniel Debowey, a psychiatrist employed part-time by North Suffolk, met with the defendant for the first time; Debowey was going to become the defendant's new psychopharmacological treater. During the meeting, the defendant was wearing socks on his hands, which Debowey noted because he knew that the defendant had been diagnosed with schizophrenia or schizoaffective disorder and, at times, bizarre elements of clothing can be a sign of relapse. However, the

defendant did not report any auditory hallucinations, nor did he appear to be responding to internal stimuli, and Debowey was not left with the impression that the defendant posed an acute risk to himself or others.

On January 21, 2011, one day after the victim was killed, Dr. Naomi Leavitt, a forensic psychologist employed by the department, conducted a court-ordered competency evaluation of the defendant.  In Leavitt's opinion, the defendant failed to understand her explanation of the fact that what he said to her would not be confidential, and made statements not reflective of reality including that he did not have a mother, that he had only finished the first grade, that he had never been in a psychiatric hospital or been diagnosed with a mental illness, that there were "rascals" out to hurt him, and that he would wake up in the morning with bruises on his body.  During the evaluation, the defendant became increasingly agitated.  Leavitt questioned the defendant's competence to stand trial and recommended that he be further evaluated at Bridgewater.  A few weeks thereafter, Dr. Charles Carroll, the director of forensic services and psychology at Bridgewater, performed two assessments of the defendant's competence to stand trial and his need for further hospitalization.  Carroll diagnosed the

defendant with schizophrenia, undifferentiated type.[11]  Carroll opined that the defendant was not competent to stand trial due to thought disorganization related to his mental illness and that the defendant required further hospitalization.

The defendant's primary mental health expert at trial was Dr. David Werner, a psychologist.  Werner met with the defendant on three occasions and reviewed the multiple medical and psychiatric records of the defendant, including records of all the defendant's hospitalizations, and police reports; he also interviewed family members.  Based on his personal meetings and review of the data, Werner diagnosed the defendant with paranoid schizophrenia.  Werner opined that the defendant suffered from hallucinations and delusions that made him unable to distinguish between voices in his head and memories of a person's voice, and that the defendant had been decompensating since July, 2010. The defendant told Werner that on January 20, 2011, he (the defendant) heard a voice telling him to kill the victim and therefore he choked her, and when he thought that she was still alive, he obtained a knife and inflicted the wounds that caused her death.  Werner ultimately concluded that the defendant was not criminally responsible for his acts on January 20, 2011, because he could not conform his conduct to the law at that

---

[11] Undifferentiated type means that the affected person presents with symptoms of various other subtypes of schizophrenia.

time.  In Werner's view, the defendant's attempts to conceal the crime after the fact were consistent with the conclusion that the defendant could not conform his conduct to the law because those attempts were so completely disorganized and ineffective.

The Commonwealth's expert witness, Dr. Martin Kelly, a psychiatrist, conducted a criminal responsibility examination of the defendant and opined that, at the time of the killing, the defendant did not suffer from a mental disease or illness that interfered with his ability to appreciate the wrongfulness of his conduct or conform his conduct to the law.  According to Kelly, when a person actually experiences auditory hallucinations, the hallucinations are part of a larger, consistent, delusional system or "back story."  Kelly opined that, although the defendant claimed to experience auditory hallucinations that caused him to kill the victim, the hallucinations were not part of a larger delusional system and were probably made up.  Kelly's opinion was also based on his view that the defendant's self-interested acts to try to cover up the crime and his participation in it demonstrated that the defendant had the capacity to appreciate the wrongfulness of his conduct.  Finally, in reviewing the records and notes prepared by the North Suffolk mental health staff and clinicians who had seen and interacted with the defendant from July, 2010, to

January, 2011, Kelly observed no decompensation by the defendant.

Discussion. 1. Substitute DNA expert. On appeal, the defendant argues that his constitutional right of confrontation guaranteed by the Federal and State Constitutions was violated when the Commonwealth's DNA expert, Lynn Schneeweis, was permitted to testify about the results of DNA testing performed by another analyst, Sarah Hughes, who was no longer employed by the State police crime laboratory (crime lab) at the time of trial and was not available to testify.[12] The argument fails.

Schneeweis held a master's degree in forensic science, was a trained DNA analyst, and also was the section manager for forensic biology at the crime lab, overseeing six or seven of the crime lab's units, including the criminalistics and crime scene units and the DNA unit. Within the DNA unit, she supervised approximately twenty-five to thirty DNA analysts. Schneeweis described in her testimony the process by which the crime lab conducts DNA analysis, including the specific protocols used. Although Schneeweis did not perform the preliminary analysis of the DNA evidence in this case, she was the "technical reviewer" and "second reader" of the DNA analysis performed by Hughes. A technical reviewer "is responsible for

_____

[12] Immediately before trial, the Commonwealth filed a motion in limine to permit Lynn Schneeweis to testify, rather than Sarah Hughes, who was in England. The judge allowed the motion.

. . . going through the file and making sure that everything was done in accordance with policy and procedure, and that the conclusions that the analyst[] draws are supported by the data that was generated during the analysis procedure," and Schneeweis performed this work in the present case. As the second reader, Schneeweis independently read all the raw data and the reports produced by Hughes, made interpretations, and ensured that there was agreement between her findings and those of Hughes. After explaining in some detail the specific work that she herself had performed, Schneeweis testified to her opinions or conclusions[13] concerning the DNA that had been collected. In particular, as stated earlier, she opined that that the major profile identified in the DNA sample taken from the fingernail scrapings of the defendant's right hand matched the defendant, and the victim was included as a contributor to the minor profile of the DNA mixture contained in this sample.[14]

---

[13] With few exceptions, in his direct examination of Schneeweis, the prosecutor asked the witness for her "conclusions" rather than "opinions," but in the context it is clear that the prosecutor was using the two words interchangeably.

[14] The fingernail scrapings were the only deoxyribonucleic acid (DNA) sample that included the defendant and the victim as possible contributors. There was no male DNA detected on swabs and scrapings collected from the victim's underpants, and therefore, testing of that DNA sample was ended. In addition, samples from reddish-brown stains on the defendant's sweatshirt and from the victim's hands were submitted for DNA analysis and the defendant was excluded from both as a potential contributor.

In addition, based again on her own independent work, she testified to her opinion that the probability of a random, unrelated individual contributing to the DNA mixture of the minor profile was approximately one out of 494,400 of African-Americans, one out of 242,800 of Caucasians, one out of 314,400 of Hispanics, and one out of 3,204,000 of Asians.

At trial, the defendant objected at the outset of Schneeweis's testimony generally on confrontation and chain of custody grounds;[15] with respect to confrontation, he argued that Schneeweis could not testify to any opinions or conclusions regarding the DNA evidence because she did not personally conduct the laboratory examination and analysis of that evidence.  The trial judge overruled the objection.  The parties appear to disagree about whether the defendant's confrontation argument on appeal is the same or different from his trial objection -- an issue that bears on the standard of review to be applied -- but we need not resolve the point, because the judge committed no error in permitting Schneeweis to testify or with respect to any of the particulars of her testimony.

With regard to a defendant's right of confrontation, as the defendant recognizes, we have permitted experts to rely on and testify to their own opinions based on "the results of tests,

---

[15] The defendant does not raise any argument concerning chain of custody on appeal, and in any event, our review reveals no error.

experiments, or observations conducted by another" since Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 532 (1986), decided nearly thirty years ago.  See Commonwealth v. Barbosa, 457 Mass. 773, 784-785, 790 (2010), cert. denied, 131 S. Ct. 2441 (2011).  Cf. Commonwealth v. Nardi, 452 Mass. 379, 383, 389-391 (2008) (opinions of substitute medical examiner based on autopsy report and photographs relating to autopsy that he did not perform).  The critical issue with respect to an expert, including in particular a DNA analyst, is whether the defendant is able to cross-examine the expert in a meaningful way regarding possible flaws relating to the underlying data that forms the basis of his or her opinion.  See Barbosa, supra at 790-791.  Compare Commonwealth v. Greineder, 464 Mass. 580, 594-599, cert. denied, 134 S. Ct. 166 (2013) (defendant had meaningful opportunity to cross-examine Commonwealth's expert about reliability of data), with Commonwealth v. Tassone, 468 Mass. 391, 399, 401-402 (2014) (defendant could not meaningfully cross-examine Commonwealth's expert witness where DNA was analyzed at different laboratory in different State from where expert worked).[16]

---

[16] We have recognized that for DNA evidence in particular, "the testing techniques are so reliable and the science so sound that fraud and errors in labeling or handling may be the only reasons why an opinion is flawed" (emphasis in original). Commonwealth v. Barbosa, 457 Mass. 773, 790 (2010), cert. denied, 131 S. Ct. 2441 (2011).  See Commonwealth v. Tassone, 468 Mass. 391, 400 (2014).

Similar to the defendant in Barbosa, 457 Mass. at 791, and particularly like the defendant in Greineder, 464 Mass. at 597-598, the defendant here certainly was able to cross-examine the Commonwealth's expert Schneeweis meaningfully about the reliability of the underlying DNA testing procedures and data, given that Schneeweis was the crime lab's section manager for forensic biology and supervisor of the crime lab's DNA analysts (including Hughes) and had been directly involved in this case as the second reader and technical reviewer; in those capacities she had reviewed both the raw DNA data produced by the crime lab's analytic instruments and the DNA samples themselves.  The defendant does not claim otherwise, but asserts, based on one statement made by Schneeweis during her direct examination,[17] that all Schneeweis did was to parrot and repeat for the jury Hughes's conclusions.

The defendant is correct that under Massachusetts law, an expert witness is not permitted to testify on direct examination to facts or data that another, nontestifying expert has generated, or to the nontestifying expert's own opinion, even though this information may be an important part of the basis of the testifying expert's opinion.  See, e.g., Greineder, supra at 592, 601-602.  See also Barbosa, 457 Mass. at 785; Nardi, 452

---

[17] Schneeweis testified that, as part of her review of Hughes's work in this case, she, Schneeweis, determined whether "the conclusions that were generated by [Hughes were] supported by the data generated during the analysis procedures."

Mass. at 390-391; Mass G. Evid. § 703 (2015). But we see no indication in Schneeweis's testimony, including the portion of her testimony to which the defendant points (see note 17, supra), that Schneeweis at any time described any part of Hughes's DNA analysis or of Hughes's testing results, opinions, or conclusions. Rather, Schneeweis described the analytic process that Hughes, as an analyst in the crime lab, would have followed, and Schneeweis's own opinions that she had formed independently and directly from the case review and analysis she herself had performed. Schneeweis's testimony was admissible in all respects, and the judge did not err in admitting it.

2. <u>Limited direct examination of defendant's primary mental health expert</u>. At trial, the defendant's counsel argued that the defendant' mental health experts, and in particular Dr. Werner, were permitted under our case law to testify on direct examination about the contents of the defendant's medical records, including medical diagnoses and opinions about the defendant's mental state that the expert had read and may have relied on in forming the expert's own opinion, even though the records themselves were not in evidence and the defense did not wish to introduce them in evidence.[18] The trial judge

---

[18] In support of this argument, the defendant cited to the trial judge a number of decisions of this court, including <u>Commonwealth</u> v. <u>Greineder</u>, 464 Mass. 580, cert. denied, 134 S. Ct. 166 (2013); <u>Commonwealth</u> v. <u>Nardi</u>, 452 Mass. 379 (2008); <u>Commonwealth</u> v. <u>Markvart</u>, 437 Mass. 331 (2002); <u>Commonwealth</u> v.

disagreed,[19] but pointed out that if the defense introduced the defendant's medical records in evidence as an exhibit, Werner (and any other expert) would then be entitled to testify concerning any opinions or other information contained in them. The defendant's counsel chose not to introduce the medical records, in part because of the voluminous quantity and the difficulty he perceived in the jury's attempting to wade through them.

On appeal, the defendant repeats the claim that it was error to preclude Werner from testifying, during his direct examination, to opinions about the defendant's mental illness and mental status more generally that were contained in his medical records. He does not focus his argument on the right of confrontation guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, but contends that this limitation violated his separate right to present a defense that is protected by these same constitutional guarantees. We disagree.

---

Waite, 422 Mass. 792 (1996); and Department of Youth Servs. v. A Juvenile, 398 Mass. 516 (1986).

[19] The judge explained:  "I think Greineder makes clear that the basis for one's opinion is properly the subject of cross-examination, but is not generally admissible as part of direct examination. . . .  And if the Commonwealth does cross-examine him on any basis for opinion[,] that then permits you on redirect to explore whatever the sources of information that he used were."

In Department of Youth Servs. v. A Juvenile, 398 Mass. at 531, we ruled for the first time that an expert may "base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion."  However, that case also makes clear that although an expert may rely on facts or data that have not been admitted but would be admissible in evidence, the expert may not testify to the substance or contents of that information on direct examination.  Id.  See Tassone, 468 Mass. at 399 ("Our evidentiary rules permit the facts or data underlying the opinion to be elicited only by the defendant on cross-examination and, where this door has been opened by the defendant, by the prosecution on redirect examination").[20]  The defendant points out that our cases discussing this rule have done so in the context of a Commonwealth expert witness, where it is the Commonwealth that is precluded from asking the expert on direct examination to testify to the content of data or even opinions generated or held by others, and the cases have emphasized that the rationale for the rule is to protect defendants from the admission of hearsay evidence by the Commonwealth.  See, e.g., Greineder, 464 Mass. at 592-594; Barbosa, 457 Mass. at 785.  The defendant

---

[20] Several cases following Department of Youth Servs. v. A Juvenile, 398 Mass. at 531, have reaffirmed this limitation. See, e.g., Greineder, 464 Mass. at 583-584; Markvart, 437 Mass. at 337-338.

contends that, where the defendant who seeks to ask his or her own expert witness about the bases for the expert's opinion, the interests are different, and the defendant's ability to present a defense is materially impaired if the expert is not permitted to explain those bases by pointing to admissible, but not admitted, evidence that the expert has reviewed and relied on.

The limitation just discussed on the direct examination testimony of an expert witness is a common-law evidentiary rule that operates in both civil and criminal cases and applies to both sides. See Department of Youth Servs. v. A Juvenile, 398 Mass. at 531-532; Mass. G. Evid. § 703. See also Vassallo v. Baxter Health Care, 428 Mass. 1, 15-16 (1998); Commonwealth v. Waite, 422 Mass. 792, 803 (1996). "A defendant's right to present a full defense . . . is not without limits," United States v. Bifield, 702 F.2d 342, 350 (2d Cir.), cert. denied, 461 U.S. 931 (1983), and as a general rule, "does not entitle him to place before the jury evidence normally inadmissible" (quotation omitted). United States v. Yousef, 327 F.3d 56, 128 (2d Cir.), cert. denied, 540 U.S. 933 (2003). See United States v. Anderson, 872 F.2d 1508, 1519 (11th Cir.), cert. denied, 493 U.S. 1004 (1989). There is no reason to apply an exception to our evidentiary rule in this case, particularly because, as the judge stated to the defendant's trial counsel, he would have been able to elicit from the defense expert on direct

examination the opinions and other information from the defendant's medical records in which he was interested by first introducing those medical records in evidence. See Mass. G. Evid. § 703. That counsel did not wish to follow this path for strategic reasons does not transform the generally applicable evidentiary requirement into an unconstitutional burden placed on the defendant.[21]

3. *Mutina* instruction. At trial, the defendant asked for a jury instruction about the consequences of a verdict of not guilty by reason of lack of criminal responsibility (*Mutina* instruction). See Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12 (1975). The defendant's request, however, was that the judge modify the Mutina instruction that is part of the Model Jury Instructions on Homicide (2013) in several respects; most substantively, he sought the addition of language that would inform the jury that if the defendant were still suffering from a mental illness and still dangerous, "[t]here is no limit to additional commitments [following the initial commitment of six months] and the defendant could be committed for the rest of his life."[22] The judge did not adopt the defendant's proposed

---

[21] Furthermore, the record shows that the defendant's expert was permitted, on direct and cross-examination, to testify at length to specific aspects of the defendant's medical and treatment records.

[22] The instruction proposed by the defendant's trial counsel also would have added to the model instruction a statement that

instruction, but gave the model <u>Mutina</u> instruction.  See Model
Jury Instructions on Homicide, <u>supra</u> at 11-12.

On appeal, the defendant argues that the judge's <u>Mutina</u>
instruction created a substantial likelihood of a miscarriage of
justice.  He claims that by including references to the number
of days the defendant might be committed for observation and
also referencing the initial six-month commitment without a
mention of the possibility that the defendant could remain
committed for the rest of his life, the instruction was unfairly
one-sided, underestimated the likely period of commitment the
defendant would face, and was likely to distract the jury from
their essential fact-finding role.  The information about the
consequences of a verdict of not guilty by reason of lack of
criminal responsibility included in the judge's <u>Mutina</u>
instruction, however, was accurate; the judge did not err in
giving it in response to the defendant's request for a <u>Mutina</u>
charge.  See <u>Commonwealth</u> v. <u>Johnston</u>, 467 Mass. 674, 702-703
(2014).  Nonetheless, the core of the defendant's criticism --
that the model <u>Mutina</u> instruction underestimates the potential,
and in the defendant's view, likely, length of confinement of a
defendant found not criminally responsible -- is one that has

---

if the jury found the defendant guilty of murder in the first or
second degree, he would be sentenced to State prison, not a
mental health facility.  The defendant does not press the point
on appeal, and we find no persuasive reason to add this
language.

been raised as a matter of concern over the years, see, e.g., Johnston, 467 Mass. at 701-702; Commonwealth v. Callahan, 380 Mass. 821, 826-827 (1980), S.C., 386 Mass. 784 (1982), and S.C., 401 Mass. 627 (1988); Commonwealth v. Loring, 14 Mass. App. Ct. 655, 659-660 (1982), and warrants our consideration.

In the Mutina case itself, this court did not prescribe or even suggest any specific form of instruction. Moreover, the court has made clear that a Mutina instruction need not mention the specific time periods for observation or commitment that are included in the civil commitment statutes.[23] See Callahan, supra at 827-828. A Mutina instruction is designed to avoid unnecessary speculation by the jury and ensure that they comprehend the possible consequences of a verdict of not guilty by reason of lack of criminal responsibility -- and in particular, to understand "what protection they and their fellow citizens will have if they conscientiously apply the law to the evidence and arrive at a verdict of not guilty by reason of [lack of criminal responsibility] -- a verdict which necessarily requires the chilling determination that the defendant is an insane killer not legally responsible for his acts." See Mutina, 366 Mass. at 821-822. On reflection, we think an instruction that omits references to specific time frames for observation and mentions the potential for successive commitment

---

[23] See G. L. c. 123, §§ 7, 8, 15 (b), 15 (e), 15 (f), 16, 18 (a), and 18 (c).

orders that could span the duration of the defendant's life in a context that accurately reflects the law governing such commitments may better accomplish these purposes. Accordingly, we propose a provisional instruction along the lines set forth in an Appendix to this opinion.[24]

4. Instruction on consciousness of guilt. The defendant requested that the trial judge omit a jury instruction on consciousness of guilt because the defense "pretty much stipulated that [the defendant] committed the homicide" and was "not contesting it." The judge denied the request, reasoning that there was no actual stipulation that the defendant had committed the homicide, and therefore the burden remained on the Commonwealth to prove beyond a reasonable doubt that the defendant did so, and a consciousness of guilt instruction was therefore pertinent and appropriate.

On appeal, the defendant's argument is more nuanced. He does not contend that a consciousness of guilt instruction should have been omitted in its entirety but rather that the judge, in exercising discretion to give such an instruction,

---

[24] With the assistance of a committee of trial court judges, this court currently is reviewing the Model Jury Instructions on Homicide that were published in 2013. The proposed instruction set out in the Appendix is a possible form of a revised Mutina instruction, but we invite the committee to review and, if appropriate, propose revisions to this proposed instruction. For the present, upon request by a defendant, a judge should give the provisional Mutina instruction set forth in the Appendix.

committed reversible error in not limiting the jury's consideration of consciousness of guilt evidence to the issue of the defendant's mental state at the time of the crime, i.e., his criminal responsibility or lack thereof.  We do not agree.  As the trial judge noted, although the defendant did not contest that he had killed the victim, the Commonwealth was still required to prove beyond a reasonable doubt that he did so and the evidence of consciousness of guilt was relevant to this question.  See Commonwealth v. Lowe, 391 Mass. 97, 108 n.6, cert. denied, 469 U.S. 840 (1984) (evidence of consciousness of guilt is relevant to whether homicide occurred).  Cf. Commonwealth v. Denis, 442 Mass. 617, 624 (2004) (no error for judge to give identification instruction, although identification not contested; necessary for Commonwealth to prove beyond reasonable doubt identification of defendant as person who committed crime, notwithstanding concessions by defense at trial).  Moreover, as the defendant's argument on appeal recognizes, actions taken by the defendant following the killing of the victim that reasonably could be interpreted to reflect consciousness of guilt[25] were relevant to an assessment of the defendant's mental state and whether he was criminally

---

[25] Such acts included, for example, setting a fire in Seagull House, arguably seeking to burn evidence of or even burn down the locus of the killing; wrapping and discarding the victim's body in a church parking lot removed from the scene of the killing; stealing and changing into different clothes; and trying to secure a place to stay with relatives and out of view.

responsible.  Accordingly, an instruction on consciousness of guilt was entirely proper in the circumstances of this case. See Commonwealth v. Cardarelli, 433 Mass. 427, 437 (2001).

5.  Relief under G. L. c. 278, § 33E.  The defendant argues that, based on the extensive evidence of his mental illness presented at trial, this court should exercise its power of review under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.  We recognize that the defendant presented substantial evidence that he lacked criminal responsibility at the time he killed the victim.  However, the Commonwealth presented substantial evidence to the contrary.  The jury were entitled to reject the testimony and opinions of the defendant's witnesses and instead credit the contrary evidence, including the opinion of the Commonwealth's expert, and to conclude that the defendant was criminally responsible.  "Tragic as this case is, it is a case where the question of criminal responsibility was truly for the jury, and justice does not require that their verdict be disturbed."  Johnston, 467 Mass. at 706.  In the circumstances of this case, based on our careful review of the trial record, we decline to reduce the degree of guilt, order a new trial, or grant other relief under G. L. c. 278, § 33E.

Judgment affirmed.

<u>Appendix</u>.


<u>PROVISIONAL MUTINA INSTRUCTION</u>[1]


<u>Consequences of Verdict of Not Guilty by Reason of Lack of Criminal Responsibility</u>.  As I have previously instructed, your decision should be based solely on the evidence and the law of this case, without regard to the possible consequences of the verdict[s].  You may not consider sentencing or punishment in reaching your verdict[s].  However, I am going to tell you what happens to a defendant if he [or she] is found not guilty by reason of lack of criminal responsibility.

First, the court may order the defendant to be hospitalized at a mental health facility for a period of observation and examination.  During this observation period or in any event within sixty days after a verdict of not guilty by reason of lack of criminal responsibility, the district attorney or other appropriate authorities may petition the court to commit the defendant to a mental health facility or to Bridgewater State Hospital.  If the court concludes that the defendant is mentally ill and that his [or her] discharge would create a substantial likelihood of serious harm to himself [or herself] or others, then the court will grant the petition and commit the defendant to a proper mental facility or to Bridgewater State Hospital, initially for a period of six months.  At the end of the six months and every year thereafter, the court reviews the order of commitment.  If the defendant is still suffering from a mental disease or defect and is still dangerous, then the court will order the defendant to continue to be committed to the mental facility or to Bridgewater State Hospital.  There is no limit to the number of such renewed orders of commitments as long as the defendant continues to be mentally ill and dangerous; if these conditions do continue, the defendant may remain committed for the duration of his [or her] life.

If at some point the defendant is no longer mentally ill and dangerous, the court will order him [or her] discharged from the mental health facility or from Bridgewater State Hospital after a hearing.  The district attorney must be notified of any hearing concerning whether the person may be released, and the district attorney may be heard at any such hearing.  However, the final decision on whether to recommit or release the defendant is always made by the court.

---

[1] See <u>Commonwealth</u> v. <u>Mutina</u>, 366 Mass. 810, 823 & n.12 (1975).

This is what happens if you find the defendant not guilty by reason of lack of criminal responsibility.