SUPERIOR COURT 
 
 COMMONWEALTH v s. BRIAN BRITO

 
 Docket:
 1777CR00255 / 1777CR00337
 
 
 Dates:
 July 3, 2025
 
 
 Present:
 Jeffrey T. Karp
 
 
 County:
 ESSEX
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S POST-VERDICT MOTION TO VACATE VERDICT (Paper No. 180)
 
 

             This Court presided over the joint trial of these cases before a jury from May 15, 2023, to June 7, 2023, during which the defendant, Brian Brito, admitted that he committed the acts charged and claimed that he lacked criminal responsibility. On June 9, 2023, the jury returned guilty verdicts on all the indictments, as charged, against Brito, including first degree murder.[1]
            A short time after the trial, defense counsel received an unsigned, anonymous letter (“Anonymous Letter”) purporting to be from an unidentified deliberating juror, which triggered post-verdict litigation that resulted in the defense conducting court- sanctioned communications with some of the eighteen trial jurors. Thereafter, it came to light that during voir dire of the jury venire, Juror 37, a deliberating juror, failed to disclose that his uncle had shot his grandfather during a mental health crisis.[2]
 
--------------------------------------------
 
[1] Brito is presently serving the sentences that the Court imposed in these matters on August 11, 2023.
[2 ]To maintain his anonymity, the Court will refer to the deliberating juror who is the subject of the Motion (hereinafter defined) by his juror number. During the trial, Juror 37 sat in seat 5.
 
                                                            -1-
 
            On June 11, 2024, these matters came before the Court for an evidentiary hearing (“Evidentiary Hearing”), during which the Court questioned Juror 37 under oath with input from the Commonwealth and Brito’s counsel. In addition to Juror 37’s testimony, the Court received three exhibits into evidence, i.e., a transcript of the individual voir dire of Juror 37 during empanelment (“Voir Dire Tr.”) (Ex. 1), and two Juror Questionnaires that were completed by Juror 37 during empanelment (Exs. 2 and 3).
            Now before the Court is Defendant’s Post-Verdict Motion To Vacate Verdict (Paper No. 180) [3] (“Motion”), which came before the Court for arguments of counsel on March 17, 2025. In the Motion, Brito argues that Juror 37 intentionally concealed the shooting incident involving his uncle and grandfather during voir dire when answering two juror questionnaires and that, as a result, the Court must “vacate the verdict[s].”[4]
            As is fully explained below, after thorough consideration of the parties’ submissions, arguments of counsel, and the evidence presented at the hearing, the
Motion is DENIED.
 
--------------------------------------------
 
[3] When citing herein to docket entries in these two matters, which were joined for trial, the Court will refer solely to the docket entries in Case No. 1777CR00255.
[4]  Notwithstanding the title of the Motion and the characterization of the relief sought by Brito, i.e., that the Court “vacate the verdicts,” the Court will treat the Motion as a motion for a new trial under Mass. R. Crim. P. 30. See Commonwealth v. Amirault, 399 Mass. 617, 625 (1987) (discussing what must be shown for granting new trial due to juror’s failure to disclose information during voir dire).
 
                                                            -2-
 
FINDINGS OF FACT
            The Court makes the following findings, which, where relevant, are based on the Court’s knowledge of the trial and post-verdict proceedings, the credible evidence produced at the hearing, and the reasonable inferences the Court has drawn from the evidence.[5]
Background
            In these cases, Brito was convicted of committing several crimes of violence against four victims during three separate incidents in March 2017.
            Taking the cases in chronological order based on the date of the underlying incident, in Case No. 1777CR00377, the jury convicted Brito of shooting two women with a firearm on March 25, 2017, on a residential street in Lawrence while they sat in a vehicle waiting to pick up a friend.[6] Both victims, who were strangers to Brito, sustained serious injuries as a result of the shooting (one of the victims, who was shot in the head, lost vision in one eye).
            In Case No. 1777CR00255, the jury convicted Brito of committing: (a) First Degree Murder on Mohammadreza Zangiband by shooting him in the head while Mr. Zangiband, a stranger to Brito, sat in a vehicle in Lynn on March 27, 2017; (b) an armed robbery with a firearm while masked of a convenience store in North Andover a few hours after the murder of Mr. Zangiband, and the aggravated kidnapping and aggravated rape of the store clerk; and, (c) unlawfully carrying a firearm, which stems
 
--------------------------------------------
 
[5] The Court sets forth additional findings of fact in the Conclusions of Law section, infra.
[6] More specifically, the jury convicted Brito of two counts of assault and battery by means of a dangerous weapon causing serious bodily injury, two counts of armed assault with intent to murder while armed with a firearm, and unlawfully carrying a firearm.
 
                                                            -3-
 
from when the police stopped Brito’s vehicle in Peabody shortly after the armed robbery of the convenience store.
The Two Juror Questionnaires
            Each prospective juror completed and signed (under oath) two questionnaires: a standard single-page document titled “Confidential Juror Questionnaire” that was sent with their juror summons by the Office of the Jury Commissioner (“OJC Questionnaire” or “OJCQ”) and an additional multi-page, case specific questionnaire, which was titled “Juror Questionnaire” and had the case caption on the first page (“Case Specific Questionnaire” or “CSQ”). The OJC Questionnaire and the Case Specific Questionnaire that were completed by Juror 37 were admitted into evidence at the Evidentiary Hearing as Exhibits 2 and 3, respectively.
            The first few pages of the Case Specific Questionnaire described the expected trial schedule, names of counsel and court staff, and contained a section that stated the following:
“Criminal Responsibility”
A significant issue during the trial will be whether at the time of the incidents, Mr. Brito was legally “insane.” In Massachusetts, we refer to whether someone was legally sane at the time of a crime as being “criminally responsible.”
During the trial, the jury may hear conflicting psychiatric testimony regarding whether or not Mr. Brito was criminally responsible during the incidents. The burden will be on the Commonwealth to prove beyond a reasonable doubt that Mr. Brito was not suffering from a mental disease or defect, or if he was, that nonetheless Mr. Brito appreciated the wrongfulness of his conduct and that he was able to conform his conduct to the requirements of the law[.]
Ex. 3, CSQ, p. 2.
 
                                                            -4-
 
            After the introductory information, the Case Specific Questionnaire contained fifty-three questions that each juror answered by circling “yes” or “no.”[7]
            A. EMPANELMENT, VOIR DIRE OF JUROR 37, AND THE TRIAL
Overview Of The Empanelment Procedure
            On May 15, 2023, empanelment of the trial jurors formally began with the Court making introductory remarks in the courtroom to the jury venire. Before that, each prospective juror had completed the OJC Questionnaire, copies of which were provided to counsel for use during voir dire. Juror 37 was among the venire and was selected to serve as a trial juror.
            After the introductory remarks, the venire was removed from the courtroom and the prospective jurors completed the Case Specific Questionnaire. Next, each prospective juror returned to the courtroom, one at a time, with their completed the Case Specific Questionnaire, and the Court examined the juror from the witness stand regarding their affirmative responses to the two juror questionnaires.[8],[9] Thereafter, counsel for the parties were given an opportunity to question each prospective juror.
 
--------------------------------------------
 
[7] One of the questions referred to a four-page list of potential trial witnesses that was attached to the Case Specific Questionnaire and asked whether the prospective juror knew any of the potential witnesses.
[8] Unlike the OJC Questionnaire, the completed Case Specific Questionnaires were not copied and disseminated to counsel during individual voir dire. Rather, each juror provided their completed Case Specific Questionnaire to the Court when they took the witness stand, and the Court identified and announced affirmative responses to counsel prior to questioning the juror.
[9] The Court told the prospective jurors that they should write a question mark in the answer box if they were confused by a question and unable respond by circling yes or no. During individual voir dire, the Court examined the prospective jurors about any questions they had flagged in this or any other manner.
 
                                                            -5-
 
            At the conclusion of the individual questioning, a court officer escorted the prospective juror to a small meeting room located inside the vestibule near the entrance of the courtroom, i.e., outside the courtroom, and counsel then exercised any cause and peremptory challenges. If the juror was selected as a trial juror, they were given a single page document titled “Instructions For Jurors” with a list of rules that they were told they must follow during the trial.[10] The juror was then released and told to return to the courthouse on May 22nd for the start of the trial.
            Eighteen trial jurors were selected through this process over four days.
The Content Of The Court’s Introductory Remarks To The Venire On May 15th
            The content of the Court’s introductory remarks to the jury venire, including Juror 37, warrants some discussion.
            Brito anticipated that his sole defense during the trial would be that he lacked criminal responsibility. Thus, with the agreement of Brito’s counsel, the Court’s introductory remarks to the jury venire included detailed factual information regarding the three incidents (and the traffic stop) that the Commonwealth expected to present during the trial.
            The Court told the venire the following. On March 25, 2017, while wearing a ski mask, Brito pulled up to a vehicle that was stopped on a street in Lawrence and shot the two female occupants, one in the head and the other in the thigh. Both occupants survived. On March 27, 2017, Brito stopped his vehicle on a Lynn street, boxing in another vehicle. Brito exited his vehicle, approached the other vehicle, and shot
 
--------------------------------------------
 
[10] The instructions told the trial jurors that, inter alia, they may not discuss the case with their fellow jurors until formal deliberations at the end of the trial.
 
                                                            -6-
 
Mr. Zangiband multiple times, killing him, and then drove away. Five hours later, Brito entered a Richdale convenience store in North Andover wearing a black mask and holding a firearm. He forced the store clerk into a back room, anally and vaginally raped her, and stole money and lottery scratch tickets. Twenty minutes after driving away from the store, Brito was stopped and arrested while driving on Route 1 in Peabody. Police recovered a firearm on Brito’s person, and a black mask and lottery scratch tickets inside his car.
            The Court then told the venire that Brito did not deny committing the acts alleged by the Commonwealth and that he asserted he was not guilty because he lacked criminal responsibility. The Court explained the concept of criminal responsibility in much the same way as the above-quoted segment of the Case Specific Questionnaire, including that the trial jury may hear conflicting psychiatric testimony regarding whether Brito was criminally responsible during the incidents, and that it would be the jury’s job at the end of the trial to decide whether the Commonwealth proved that he was criminally responsible.
            Finally, using a model instruction promulgated by the SJC in Commonwealth v. Chappell, 473 Mass. 191, 206, 209 (2015) (Appendix), the Court told the venire with some specificity the consequences to a defendant who is found not guilty by reason of lack of criminal responsibility, i.e., inter alia, that the Commonwealth could petition the court to commit the defendant to Bridgewater State Hospital where he would remain for so long as he was found to be mentally ill and dangerous.
 
                                                            -7-
 
The Individual Voir Dire Of Juror 37
            As stated, the individual voir dire of Juror 37 was conducted on May 15th during the first day of empanelment in the manner described above.[11]
            On the OJC Questionnaire, Juror 37 identified himself as male, and disclosed that he was forty-six years old, had earned a master’s degree, was married, had two young children (six and seven years old), had been “served with a court order” during divorce proceedings, had been a “Commanding Officer” in the Navy, and was presently employed as a “government contractor.” Ex 2, OJC.
            In response to a question on the OJC Questionnaire which asked, “Have you or anyone in your household or family ever had any of the following experiences with the law?,” Juror 37 left the following boxes, inter alia, unchecked (i.e., thus answering the question in the negative):
*Been arrested?
*Been charged with a crime?
*Been convicted of a crime?
*Been a crime victim?
Id.
            In response to a question on the OJC Questionnaire which asked, “Is there anything else about your background, experience, employment, training . . . that might affect your ability to be a fair and impartial juror?,” Juror 37 wrote, “Former military (Navy) Commanding Officer. Our internal judicial system varied from [the] court system.” I d.
 
--------------------------------------------
 
[11] The Court remembers the voir dire of Juror 37. The Court specifically recalls Juror 37’s military-like demeanor, his thoughtfulness and earnestness when answering questions of the Court and defense counsel, and, what struck the Court at the time, his sometimes lawyer-like way of explaining his answers.
 
                                                            -8-
 
            As for the Case Specific Questionnaire, Juror 37 answered “yes” to (or flagged) nine questions, including questions pertaining to potential scheduling conflicts, knowing something about the case, and having potential concerns about sexually graphic evidence, all of which the Court explored with him during individual voir dire.
            More specifically, the Court explored Juror 37’s “yes” answers to the following questions on the Case Specific Questionnaire:
42. Have you or someone close to you ever been a victim of a sexual assault, whether or not it was reported to the police?
            44. Do you have any training or experience regarding mental health issues?
46. Have you or someone close to you ever suffered from a major mental health disorder, such as schizophrenia, schizoaffective disorder, bipolar disorder, cycling mood disorder, antisocial personality disorder, persistent polysubstance abuse disorder, etc.?
47. Do you feel that someone with mental illness can overcome it through willpower, self-discipline, or by “shaking it off”?
Ex. 3, CSQ, p. 8.
            In response to the Court’s inquiry, Juror 37 stated the following. As a Commanding Officer with the Navy, he oversaw combat ships that were approximately 500 feet long and had approximately 90 sailors. In that role, he was “directly involved in sexual assault victim prevention.” Ex. 1, Voir Dire Tr., p. 8. During their marriage, Juror 37’s spouse had been a victim of a sexual assault during a “work-related incident.” Id. at 10.
            Juror 37 also disclosed that he had spoken to his wife for “a considerable amount of time” about the incident that occurred at the convenience store which the Court had described during its introductory remarks, because the store was “less than a mile from
 
                                                            -9-
 
where [he] lived.” Id. at p. 7. And, Juror 37 disclosed that his uncle, with whom he was “very close,” “was obsessive compulsive, manic depressive, schizophrenic, he had a number of issues” and that his “biological father was in the same category as well.” Id. at p. 11.
            After the Court questioned Juror 37, the Commonwealth declined to ask him any questions.
            During questioning by Brito’s counsel, Juror 37 explained that the ships he had commanded had their own justice system that followed “the Uniform Code of Military Justice,” and for “[c]ivil-type offenses on board a ship at sea,” unlike criminal offenses for which the accused had the right to a trial by jury, he had “serve[d] as both [the] [j]udiciary [and] the jury.” Id. at p. 15. Juror 37 further explained to Brito’s counsel that, if he was selected to serve on the deliberating jury, “[he] would have to probably consciously remind [him]self that it [wa]s not just [him] deciding, but there’s . . . a number of [jurors] in the room that would be deciding and [it] had to be a unanimous decision.” Id. at p. 16. Further, along these lines, Juror 37 explained that he would need to ensure that his “force of nature . . . d[id]n’t get to take over [the deliberations].” Id. And, in response to counsel’s observation that, “Once a Commanding Officer, always a Commanding Officer,” Juror 37 replied, “Sometimes yes. My children would definitely agree with that statement.” Id.
            Brito’s counsel also deeply explored Juror 37’s experience with mental health issues. In response to a question regarding whether it was noticeable to him when his uncle and father “were . . . in the throws [sic] of a schizophrenic” episode, id. at p. 18, Juror 37 stated that, “With my father it was pretty evident at the time he was in a manic
 
                                                            -10-
 
state or . . . depressed stated,” and, as to his uncle, “It took slightly more time to recognize . . .  what he may be contending with at the time.” Id. at p. 19. Further, in response to a question by Brito’s counsel regarding whether his father had “psychotic thoughts,” Juror 37 responded, “My biological father did not, my uncle did, yes.” Id.
            When asked by defense counsel whether he believed that mental illness could be overcome or controlled if he had “enough willpower . . . [and] buckled down, the way [he] would in the military . . . .,” id., Juror 37 replied that he believed that it could be managed, “but it is not necessarily just by sheer force of will alone . . . ” Id. at p. 20.
            In response to a question whether he “would . . . have any concerns if [he was] on the jury about returning a verdict of not guilty by reason of insanity . . ., that [he’]d be releasing somebody to the streets who . . . might be dangerous,” id. at pp. 20–21, Juror
37 answered, “No, I do not.”[12] I d. at p. 21.
            In sum, the voir dire of Juror 37 lasted more than nineteen minutes. Unsurprisingly, neither party challenged him for cause. The Court recalls that it had no doubt that Juror 37 would be a fair and impartial juror.
The Trial, Jury Deliberations And Verdict
            The evidence, consisting of testimony from dozens of witnesses and more than 150 exhibits, was presented over approximately ten trial days.
            The jury deliberated for fifteen hours over two days before returning guilty verdicts on all the indictments.
 
--------------------------------------------
 
[12] Based the Court’s observations of Juror 37’s demeanor and body language, it was clear to the Court that Juror 37 credibly and sincerely expressed genuine empathy and acceptance of persons afflicted with mental illness.
 
                                                            -11-
 
            B. RELEVANT POST-VERDICT PROCEEDINGS[13],[14]
            As stated, a short time after the conclusion of the trial, defense counsel received the Anonymous Letter, which was postmarked June 14, 2023, a mere five days after the verdict. Ex. A. The Anonymous Letter stated, in pertinent part, that, “During deliberations it came to our attention, that one of the jurors’ [i.e., Juror 37] uncle had shot his father in the head during a psychotic episode . . . . ” Id. Thereafter, the defense conducted court-sanctioned communications with some of the eighteen trial jurors.
Relevant Information Contained In The Affidavits Of The Trial Jurors
            In October 2023, Brito obtained affidavits from three of the trial jurors: two deliberating jurors, Juror 11 and Juror 15 (see Exs. B and D, respectively) and one alternate juror, Juror 17.[15] See Ex. C.
            According to the affidavit of Juror 11, a deliberating juror, “[Juror 37], who was retired from the Navy, told the jury that during a schizophrenic break, his uncle had shot
 
--------------------------------------------
 
[13] An in-depth recitation of the post-verdict proceedings in these matters is set forth in the Court’s Second Order On Defendant’s Requests For A Post-Verdict Judicial Inquiry Of Jurors And For Defense Counsel To Communicate With Jurors (Paper No. 165) and the Court’s Memorandum Of Decision And Order After Evidentiary Hearing On Defendant's Renewed Motion For Judicial Inquiry Of Jurors (Paper No. 179) (“Renewed Motion Decision”), which the Court will not repeat here. However, a brief discussion about the evidence the defense gathered from certain members of the trial jury that led to the judicial inquiry of Juror 37 is warranted.
[14] During the Evidentiary Hearing, the Court sustained the Commonwealth’s objections to four exhibits offered by Brito, i.e., the Anonymous Letter and affidavits of three trial jurors. The four items were marked for identification at the hearing, as follows: the Anonymous Letter (Ex. A), two affidavits of deliberating jurors (Exs. B and D), and an affidavit of an alternate juror (Ex. C).
            For the reasons discussed, infra, in § I of the Conclusions of Law, the Court has determined that it erred in precluding in toto Brito’s exhibits and has vacated its ruling sustaining the Commonwealth’s objections. Thus, in the remainder of this Decision, the Court sets forth information from Exhibits A, B, C, and D, that it considered in deciding the merits of the Motion.
[15] To maintain their anonymity, the Court will refer to the jurors by their seat numbers.
 
                                                            -12-
 
his grandfather; other jurors said that is awful.” Ex. B, ¶ 5(a). “[Juror 37] mentioned this incident once during trial when [Juror 11] was in one of the two waiting rooms waiting to be called into the courtroom.” Id. at ¶ 5(b).
            Juror 11 further reported the following:
[D]uring deliberations, whenever any other juror had questions, or seemed to be going the other way, [Juror 37] would repeat the story about his uncle shooting his grandfather, and tell us that even though he was schizophrenic his uncle knew what he was doing, and that the defendant knew what he was doing and should not get away with this. [Juror 37] said that even if you are sick, you know what you are doing, and you cannot shoot or rape someone and then excuse it by saying you’re mentally ill.
Id. at ¶ 5(c).
            According to the affidavit of Juror 15, another deliberating juror, “[o]n the first day of jury deliberations, [Juror 37] told the rest of the jury that he had experience in his own family with mental illness. [S]pecifically that a family member who was mentally ill had shot and killed another family member during a psychotic break.” Ex. D, ¶¶ 5(b) – 5(c).
            According to the affidavit of Juror 7, an alternate juror:
In a group text [among some of the trial jurors] on October 4, 2023 . . . [Juror 37] said that unless his memory was failing him he had specifically talked about the incident between his grandfather and uncle during jury selection, as well as the fact that he had a brother- in-law who was severely ill with mental illness, schizophrenic, etc.
Ex. C, ¶ 4(d).
The Hearing On May 17, 2024
            On May 17, 2024, the parties were before the Court for a nonevidentiary hearing on the Defendant’s Renewed Motion For Judicial Inquiry Of Jurors (Paper No. 167) (“Renewed Motion”). In the Renewed Motion, Brito argued that he was entitled to a judicial inquiry of all of the eighteen trial jurors (i.e., six alternates and twelve
 
                                                            -13-
 
deliberating jurors) for two reasons. First, Brito pointed to the affidavits of two deliberating jurors and argued that Juror 37 told jurors during the trial that his uncle had shot his grandfather during a “schizophrenic break,” which Brito claimed is extraneous, prejudicial information (“Extraneous Matters Claim”). See Commonwealth v. Guisti, 434 Mass. 245, 251 (2001) (“A trial judge . . . is under no duty to conduct a[ post-verdict] inquiry [of a juror] unless the defendant makes a ‘colorable showing’ that extraneous matters may have affected a juror’s impartiality.”).
            Second, Brito argued in the Renewed Motion that he is entitled to a judicial inquiry of all of the trial jurors because Juror 37 failed to disclose information about the shooting when asked to do so during empanelment (“Failure To Disclose Claim”). See Commonwealth v. Mitchell, 102 Mass. App. Ct. 831, 841 (2023), aff’d, 496 Mass. 66 (2025) (“When . . . it is discovered after trial that a juror failed to disclose information during voir dire and that that failure raises a nonspeculative question about the juror’s impartiality, the remedy ‘is a hearing in which the defendant has the opportunity to prove actual bias.’”).
            At the conclusion of the May 17th hearing, the Court allowed Brito’s request for a judicial inquiry of Juror 37 on his Failure To Disclose Claim and denied his request for a judicial inquiry of the other deliberating jurors on his Extraneous Matters Claim. See Renewed Motion Decision (Paper No. 179).
 
                                                            -14-
 
            C. THE JUDICIAL INQUIRY OF JUROR 37
            On June 11, 2024, during the Evidentiary Hearing, the Court conducted a judicial inquiry of Juror 37, who was 47 years old at the time. He testified under oath in open court.
            Before the Court began questioning Juror 37, the Court provided him with the two questionnaires he had completed during empanelment and the transcript of his testimony during voir dire on May 15, 2023. The Court asked Juror 37 to read the questionnaires and transcript to himself, which he did while seated on the witness stand, and retrieved them when he was finished.
            Then, the Court began by questioning Juror 37 about whether his uncle or his biological father had “ever commit[ted] any acts of violence at all, whether it was against other people or against themselves?”[16] Transcript of Evidentiary Hearing, June 11, 2024, (“Evid. Hr’g Tr.”), p. 68.
            With respect to his father, who was “obsessive/compulsive [and] manic/depressive,” id. at p. 86, Juror 37 stated the following:
When I was younger there were a number of instances before my parents separated where he had become, or would be very angry and very upset, emotionally upset and my mother would call the local police authorities and they would have to come to the house and restrain him and remove him. …. [He] was arrested multiple times.
Id. at pp. 68 – 69. Juror 37 clarified that this occurred when he was “four or five years old.” I d. at p. 86.
 
--------------------------------------------
 
[16] When asked, Juror 37 explained that his reference during voir dire to his father as his “biological” father was because he also had a stepfather. For simplicity sake, the Court will refer to Juror 37’s biological father simply as “his father.”
 
                                                            -15-
 
            Juror 37 further stated that his parents divorced when he was “five or six years old,” I d. at p. 86, and that his father died in approximately “2019 [or] 2020.” Id. at p. 69. After becoming an adult, Juror 37 was not close to his father and, in fact, when Juror 37 was in his late thirties, he stopped communicating with his father.
            Juror 37 reported that, when he was in his early twenties and stationed by the Navy in California, his maternal uncle, who had suffered from mental illness, shot Juror 37’s maternal grandfather in the back of the neck with a small caliber (.22 cal.) handgun after becoming angry during a card game. The incident happened late in the afternoon at the home in Michigan which Juror 37’s grandparents and his uncle had shared.
            Based on discussions he had with his uncle, grandfather, and grandmother about the shooting, Juror 37 came to believe that the shooting stemmed from a mood disorder that caused his uncle to suddenly become angry and act irrationally during the card game. His grandfather, with whom Juror 37 remains “very close,” suffered a “through and through” injury to his neck and “was mildly injured” (he walked out of the house on his own power), and was briefly hospitalized.
            Juror 37’s uncle was arrested for the shooting and sent to a mental health facility. Although Juror 37’s grandfather “did not press charges,” his uncle was convicted of an unknown charge and was “incarcerated for a short period of time.” Juror 37 did not visit his uncle while he was incarcerated and did not attend any of the court proceedings. After his uncle was released from prison, Juror 37’s grandparents immediately welcomed back his uncle to stay at their home. This was the only act of violence committed by his uncle of which Juror 37 was aware. Although the shooting made Juror 37 sad, it never caused him to be mad at his uncle. His uncle died in 2008.
 
                                                            -16-
 
Juror 37’s Negative Responses To The Question On The OJC Questionnaire Regarding Experiences With The Law
            The Court then asked Juror 37 about his negative responses to the question on the OJC Questionnaire which asked whether anyone in his “household or family” had ever been arrested, charged with a crime, convicted of a crime, or been a crime victim. See Ex. 2, OJCQ. The Court asked Juror 37 why he didn’t disclose the shooting incident in response to this question on the OJC Questionnaire given that his uncle was arrested, charged, and convicted of a crime, and his grandfather, with whom he is close, was a crime victim.
            Juror 37 credibly explained that the question referred to anyone in his (household or) family, which he understood at the time to mean his immediate family, and he considered his uncle and grandfather to be members of his “extended” family.
Juror 37’s Negative Answers To Questions 40 And 41 On The Case Specific Questionnaire
            The Court next turned to Juror 37’s “no” answer to Question 40 on the Case Specific Questionnaire, which asked the following:
40. Have you or someone close to you ever been a victim of a violent crime, whether or not it was reported to the police?
Ex. 3, CSQ, p. 7 (emphasis added).
            When asked by the Court why he didn’t answer “yes” to Question 40 given that his grandfather had been a victim of the shooting, Juror 37 stated the following:
So when I read that question, Your Honor, you or someone close to you, so my uncle is a peripheral family member, so not somebody in my immediate family, so the context of that relationship. And then in the context of violent crime, well my uncle was certainly arrested and went to jail for it, because the nature of the incident and the fact that our entire family forgave him, at least to myself we did not consider that a violent act or a violent crime. It was more of, you know, an
 
                                                            -17-
 
incident of just, you know, unfortunate circumstances to my uncle’s disease.
Evid. Hr’g Tr., pp. 97 - 98 (emphasis added).
            When pressed by the Court regarding his “no” answer to Question 40, given his “very close” relationship with his grandfather, Juror 37 reiterated that he understood the question to refer to immediate family members, such as his spouse and children, and clarified that at the time he completed the Case Specific Questionnaire during voir dire, he focused on the second part of Question 40, and “did not consider what happened to hi[s grandfather] to be a violent crime.” Id. at p. 99.
            The Court then turned to Juror 37’s “no” answer to Question 41 on the Case Specific Questionnaire, which asked:
41. Have you or someone close to you ever been accused of committing a violent crime, whether or not it was reported to the police?
Ex. 3, CSQ, p. 8 (emphasis added).
            Juror 37 stated that he was not aware of what his uncle was charged with and explained that, “But what he did do and what I was aware of, I did not consider what he did to be a violent crime, largely again because of our familial circumstances and how we approached it.” Evid. Hr’g Tr., p. 100.
            Juror 37 further explained that, when answering the questionnaires during voir dire, he didn’t consider the shooting incident to be a violent crime because he believed that his uncle’s thinking at the time was impaired by a “mood adjustment disorder,”17 his
 
--------------------------------------------
 
[17] Although the Court did not ask Juror 37 what he meant when he referred to his uncle’s “mood disorder” and “mood adjustment disorder,” he described his uncle as having a long history of suddenly becoming intensely angry with little provocation. See e.g., American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013), p. 286
 
                                                            -18-
 
uncle did not intend to harm his grandfather (and did not seriously hurt him), his grandfather did not “press charges,” his grandparents immediately forgave his uncle because they recognized that, due to his uncle’s long history of mental illness,18 his uncle did not intend to harm his grandfather, and his grandparents forgave his uncle and welcomed him back into their home when he was released from jail. In fact, according to Juror 37, after later spending a lot of time with his uncle discussing the incident, Juror 37 concluded that his uncle’s mental illness had “taken over” and caused him to be very aggressive, angry, and upset, and to lose control of his “facilities.” Id. at p. 114. As Juror 37’s grandfather understood it at the time, his uncle didn’t mean to shoot him, just scare him; “it was more like the gun went off and not . . . like I’m trying to murder the guy.” Id. at p. 115.
            Thereafter, the Court asked Juror 37, “How is it possible that shooting somebody in the neck with a .22 . . . pistol [at close range is] . . . not a violent crime[?]” and “[W]hat were you thinking at the time when you were . . . answering [Questions] 40 and 41, let me just press you, how can that not be a violent crime?” Id. at p. 120. Juror 37 responded that long ago he had spoken to his grandfather and grandmother, who witnessed the shooting, and he (and they) concluded that his uncle “was not of his own mind” and did not intend to harm or murder his grandfather. Based on Juror 37’s training and experience in applying the Uniform Code of Military Justice as a commanding
 
--------------------------------------------
 
(stating symptoms of an “adjustment disorder” include “[m]arked distress that is out of proportion to the severity or intensity of the stressor     . . . ).
[18] Juror 37 stated that his uncle had been discharged from the Navy due to mental illness when his uncle was approximately twenty years old.
 
                                                            -19-
 
officer in the Navy, “when [he] think[s] of a violent crime[, he] think[s] of intent” to harm, something his uncle lacked at the time of the shooting. Id. at p. 122.[19]
Question 46 On The Case Specific Questionnaire
            The Court then turned to Question 46 on the Case Specific Questionnaire, which stated the following:
46. Have you or someone close to you ever suffered from a major mental health disorder, such as schizophrenia, schizoaffective disorder, bipolar disorder, cycling mood disorder, antisocial personality disorder, persistent polysubstance abuse disorder, etc.?
Ex. 3, CSQ, p. 8.
            The Court began by asking Juror 37 if there was anyone other than his uncle and father that he was close with at the time of the trial that suffered from any major mental health issues, such as his brother-in-law.[20] He explained that he had a former brother- in-law who suffered from paranoia, but Juror 37 had not been in contact with him since at least 2013, when his brother-in-law’s marital status changed. Thus, at the time of voir dire, Juror 37 did not consider his former brother-in-law to be “someone close to” him. The Court finds that this testimony was truthful, and it fully credits the same. Further, the Court rules that, as to his brother-in-law, Juror 37 accurately answered Question 46 on the Case Specific Questionnaire during voir dire.
            When asked about his uncle’s mental illness, Juror 37 confirmed that his uncle suffered from schizophrenia and bipolar disorder, and, as a result, his uncle’s mood
 
--------------------------------------------
 
[19] The Court sets forth its findings and rulings regarding Juror 37’s testimony in this area below in § II of the Conclusions Of Law.
[20] The aforementioned group text message described by Juror 7 in his affidavit prompted the Court to ask this question. See Ex. C, p. 2.
 
                                                            -20-
 
would change “very quickly” to anger and depression.[21] However, he was not aware of his uncle having suffered from psychosis, “like seeing things or hearing things [or] being directed by other entities than oneself.” Evid. Hr’g Tr., p. 102.
Inquiry About Conversations With His Fellow Jurors
            The Court asked Juror 37 whether he had any conversations with his fellow jurors during the trial (as opposed to during deliberations) about the shooting incident or his uncle and father’s mental health issues, and Juror 37 replied, “Not that I can recall during the trial, no, Your Honor.” Id. at p.103.
            The Court asked Juror 37 for a “yes or no answer” to whether he talked with his fellow jurors during deliberations about the shooting incident and, if so, how many times, Juror 37 replied, “Yes . . . [o]nce.” Id.
            Based on the Court’s observations of Juror 37’s demeanor and body language when answering these questions during the Evidentiary Hearing, the Court finds that Juror 37 truthfully answered the questions to the best of his ability and memory.
CONCLUSIONS OF LAW
            With respect to the Failure To Disclose Claim, Brito argues that the verdicts must be vacated (and a new trial ordered) because Juror 37 failed to disclose the shooting incident involving his uncle and grandfather. He further argues that the Court erred in denying his request for a judicial inquiry of all the trial jurors regarding his Extraneous Matters Claim.
            The Court will address these arguments in turn. However, before doing so, the Court reconsiders one of the evidentiary rulings that it made during the Evidentiary
 
--------------------------------------------
 
[21] Juror 37 stated that his uncle had many incidents of “aggression” due to his uncle’s mental illness, including during card games.
 
                                                            -21-
 
Hearing regarding the admissibility of the four exhibits proffered by Brito (i.e., Exs. A – D).
I. DURING THE EVIDENTIARY HEARING, THE COURT ERRED IN SUSTAINING THE COMMONWEALTH’S OBJECTIONS TO BRITO’S FOUR PROPOSED EXHIBITS AND RULING THAT IT WOULD NOT CONSIDER THEM
            During the Evidentiary Hearing, Brito offered four exhibits: the Anonymous Letter (Ex. A), and affidavits from two deliberating jurors, Juror 11 (Ex. B) and Juror 15 (Ex. D), and an alternate juror, Juror 7 (Ex. C). As is pertinent here, each of the proposed exhibits contain statements made during the trial that are attributed to Juror 37. This includes a statement attributed to Juror 37 in the Anonymous Letter, which the Court previously ruled contained self-authenticating information from a deliberating juror. See Second Order On Defendant's Requests For A Post-Verdict Judicial Inquiry Of Jurors And For Defense Counsel To Communicate With Jurors (Paper No. 165).
            The Commonwealth objected to the admission of the four proposed exhibits on hearsay and relevancy grounds. In addition, the Commonwealth argued that the affidavits of the two deliberating jurors contained inadmissible statements made during jury deliberations. See Renewed Motion Decision (Paper No. 179), p. 2 n.3; see also Mass. G. Evid. § 606(c) (prohibiting consideration of affidavits from jurors regarding statements made during deliberations). The Court sustained the objections as to all four of Brito’s proposed exhibits, ruling that it would not consider them in deciding the merits of the Motion.
            In the Motion (and his supplemental memoranda), Brito argues that the Court erred in sustaining the Commonwealth’s objections to his proposed exhibits, and he liberally quotes and refers to them. After further thought, the Court now believes that it
 
                                                            -22-
 
erred in precluding consideration, in toto, of the statements attributed to Juror 37 in the four proposed exhibits. The Court reaches this decision for the three reasons that follow.
A. The Court May Consider The Exhibits For A Nonhearsay Purpose
            First, as to the Commonwealth’s hearsay objection, leaving aside that the rules of evidence likely did not strictly apply at the Evidentiary Hearing, statements attributed to Juror 37 in the proposed exhibits can be considered by the Court not for their truth, but rather to show that Juror 37 did, in fact, make statements about information that he may have failed to disclose during voir dire. See Commonwealth v. Keown, 478 Mass. 232, 245 (2017) (“If a statement is offered for any purpose other than for its truth, it is not hearsay.”).
B. Juror 37’s Purported Statements In The Exhibits Are Relevant
            Second, as to the Commonwealth’s relevancy objection, statements of Juror 37 in the proposed exhibits are relevant to the Court in deciding whether he “‘failed to answer honestly a material question on voir dire,’” Amirault, 399 Mass. at 625, which, as is discussed below, is the dispositive factor in deciding the merits of the Motion.
C. Purported Statements Made By Juror 37 During Deliberations Are Admissible For Limited Purposes
            Third, the Court erred in deciding to preclude the statements made by Juror 37 during deliberations that are contained in three of the proposed exhibits, i.e., in the Anonymous Letter, and the two affidavits of deliberating jurors. The reason for this ruling requires some discussion by the Court.
 
                                                            -23-
 
            In general, a “judicial inquiry cannot delve into jurors’ subjective reasoning or deliberative content.” Read v. Commonwealth, 495 Mass. 312, 330 (2025). Consequently, “[d]uring an inquiry into the validity of a verdict, . . . a juror may not testify about any statement made or incident that occurred during the jury’s deliberations, the effect of anything on that juror’s or another juror’s vote, or any juror’s mental processes concerning a verdict.” Mass. G. Evid. § 606(b). Moreover, “[t]he court may not receive a juror’s affidavit or evidence of a juror’s statement on these matters.” Id. In fact, “[the SJC] ha[s] stressed that, when speaking to a deliberating juror, a judge must take extreme caution to avoid delving into deliberations.” Commonwealth v. Ralph R., 490 Mass. 770, 780 (2022).
            The reason for this prohibition is that “‘[t]he secrecy of jury deliberations has served as a bedrock of our judicial system, and inquiry into the jury’s deliberative processes … would intrude improperly into the jury’s function.’” Id. (quotation and citation omitted). Thus, “[w]ith few exceptions, [the SJC] adhere[s] to the principle that ‘it is essential to the freedom and independence of [jury] deliberations that their discussions in the jury room should be kept secret and inviolable.’” Commonwealth v. Pytou Heang, 458 Mass. 827, 858 (2011) (citations omitted).
            Nevertheless, “[the SJC’s] rule does not create an absolute prohibition against juror testimony to impeach a verdict.” Commonwealth v. Fidler, 377 Mass. 192, 196
(1979) (citations omitted). In fact, as is pertinent here, “[a] juror may testify about whether . . . information provided by the juror as part of the empanelment process was inaccurate or incomplete.” Mass. G. Evid. § 606(c)(3).
 
                                                            -24-
 
            While the Court was unable to find a reported decision that addresses the extent to which a juror may testify about “inaccurate or incomplete” information provided during voir dire, id., decisions regarding the admissibility of juror testimony when a court considers whether deliberations were affected by improper extraneous influences are instructive.
            For example, the SJC long ago “concluded that juror testimony is admissible to establish the existence of an improper influence on the jury, but is not admissible to show the role which the improper influence played in the jury’s decisions.” Fidler, 377 Mass. at 196 (citations omitted); see also Commonwealth v. Dunnington, 390 Mass. 472, 478 (1983) (“This testimony is not admissible to demonstrate the effect that the extraneous matter had upon the juror's thought process.”). In such an instance, “[o]nce any juror has established that extraneous information was mentioned, by whom, and whether anyone said anything else about the extraneous information (not what they thought about it or did with it), the inquiry of that juror is complete.” Commonwealth v. Kincaid, 444 Mass. 381, 391 - 392 (2005). At bottom, the inquiry is “limited to whether th[e] statement was in fact made [during deliberations], and whether it may have constituted an extraneous ‘disturbing influence.’” Fidler, 377 Mass. at 200.
            Here, as it relates to Brito’s Failure To Disclose Claim, it stands to reason that the Court may consider statements made by Juror 37 during deliberations that are contained in the affidavits of the two deliberating jurors in determining whether he, in fact, made the statements, but not the role the statements may have played in the jury’s decisions, deliberative processes, or on a juror’s subjective thought process in deciding Brito was guilty. See Commonwealth v. McCowen, 458 Mass. 461, 494 n.35 (2010)
 
                                                            -25-
(“Where juror testimony is needed to ascertain whether [a] racist statement was made [during deliberations], a judge may inquire of the jurors whether the statement was made but may not inquire into their subjective thought process, such as their reasons for concluding that the defendant was guilty, the content of their deliberations, or the effect of the statement at issue on their thought process); see also Commonwealth v. Moore, 474 Mass. 541, 552 (2016) (“If, after communicating with a juror, an attorney wishes to secure an affidavit from the juror concerning alleged extraneous influences on the jury deliberation process, the attorney may do so . . . , but any such affidavit must focus on extraneous influences, and not the substance of the jury's deliberations or the individual or collective thought processes of the juror or the jury as a whole.”).
D. The Court Vacates Its Ruling Sustaining The Commonwealth’s Objections To Exhibits A Through D
            Therefore, the Court vacates its ruling at the Evidentiary Hearing that sustained the Commonwealth’s objections to Exhibits A through D. And, the Court now overrules the objections as to statements in the exhibits that are attributed to Juror 37, subject to the aforementioned limitations on how the information may be considered by the Court. Thus, in deciding the merits of the Motion, the Court has considered statements attributed to Juror 37 that are set forth in Exhibits A through D, including statements made by Juror 37 during deliberations.[22]
 
--------------------------------------------
 
[22] To be clear, the only statement in the Anonymous Letter that concerns Juror 37 states, “[d]uring deliberations it came to our attention[] that one of the jurors’ uncle had shot his father in the head during a psychotic episode. ([I] believe his [first] name was [Juror 37’s first name]).” Ex. A.
 
                                                            -26-
 
II.  JUROR 37 DID NOT DISHONESTLY ANSWER A MATERIAL QUESTION DURING VOIRE DIRE AND JUROR 37 WAS NOT BIASED
            The Court will now turn to the merits of Brito’s Failure To Disclose Claim.
            A. Legal Framework
            “Article 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment’s due process clause, guarantee a criminal defendant the right to trial by an impartial jury . . . A jury is impartial when it is ‘capable and willing to decide the case solely on the evidence before it.’” Commonwealth v. Mitchell, 496 Mass. 66, 74 (2025). “Even a single biased juror violates this right and undermines the integrity of the defendant's trial.” Id. “‘Voir dire examination serves to protect th[is] right by exposing possible biases, both known and unknown, on the part of potential jurors.” Commonwealth v. Murphy, 86 Mass. App. Ct. 118, 125 (2014). Nevertheless, “[w]hile a defendant’s constitutional right to an impartial jury is inviolable, that does not mean defendants are ‘entitled to perfection in the trial process.’” Mitchell, 496 Mass. at 74
(citation omitted).
As the SJC recently stated in Mitchell:
Where . . . a defendant claims that his right to an impartial jury was violated due to a dishonest answer provided during juror voir dire, [courts] apply the framework set forth in Commonwealth v. Amirault, 399 Mass. 617, 624 - 625 (1987). Under the Amirault standard, [the court] first examine[s] whether a juror “dishonestly answered a material question on voir dire.” . . . If the juror’s answer to a material question was dishonest, the defendant must then demonstrate, by a preponderance of the evidence, that the juror was not impartial — i.e., that the juror was biased . . . A defendant may do so by demonstrating that the juror did, in fact, harbor actual bias against him, or by demonstrating that the surrounding factual circumstances
 
                                                            -27-
 
are otherwise so extreme that the juror’s bias can be presumed as a matter of law.
Id. at 74 – 75 (citations omitted). Further, if the defendant meets his burden to show that a juror dishonestly answered a material question during voir dire and was biased, to be granted a new trial, the defendant must “‘further show that a correct response would have provided a valid basis for a challenge for cause.’” Amirault, 399 Mass. at 625.[23]
            Here, Brito argues that Juror 37 was biased because he failed to disclose that his uncle shot his grandfather during a mental health crisis in his response to the aforementioned “experiences with the law” question on the OCJ Questionnaire, and by answering “no” to Questions 40 and 41 on the Case Specific Questionnaire. The Court disagrees for the following reasons.
 
--------------------------------------------
 
[23] In Amirault, the SJC, quoting the United States Supreme Court in McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984), stated that a defendant seeking a new trial because a juror failed to provide accurate information during voir dire:
“[M]ust first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.”
Amirault, 399 Mass. at 625 (emphasis added).
            Thereafter, our appellate courts mostly included the highlighted element in their recitation of the standard. S ee e.g., Commonwealth v. Emerson, 430 Mass. 378, 384 (1999); Murphy, 86 Mass. App. Ct. at 125. However, in Mitchell, the SJC did not include this element in the standard it applied and stated the following in a footnote:
To be clear, our lodestar for analyzing postverdict claims of juror dishonesty is the standard set forth by this court in Amirault and discussed herein. To the extent that the formulation endorsed by the plurality in McDonough diverges from the Amirault standard, it does not control, notwithstanding any passing references to McDonough in prior decisions.
Mitchell, 496 Mass. at 74 n.17. Thus, this element, which is not dispositive here, arguably may no longer be required.
 
                                                            -28-
 
B. Juror 37 Did Not Dishonestly Answer A Material Question During Voir Dire
I. Juror 37 Did Not Dishonestly Answer Questions On The OJC Questionnaire With Respect To The Shooting Incident Involving His Uncle And Grandfather
            The OJC Questionnaire asked, in pertinent part, whether anyone in Juror 37’s “household or family” had ever been arrested, charged with a crime, convicted of a crime, or been a crime victim. See Ex. 2. In response, Juror 37 did not disclose that his uncle was arrested, and charged and convicted of a crime, and that his grandfather was a crime victim. The Court concludes that, by failing to disclose this information, Juror 37 inaccurately answered the question on the OJC Questionnaire.
            During the Evidentiary Hearing, Juror 37 explained that, at the time he completed the OJC Questionnaire, he understood that the phrase “household or family” as used in this question meant immediate family. Juror 37 further explained that he did not consider his uncle and grandfather to be members of his immediate family, rather he considered them to be members of his “extended” family.
            The Court finds Juror 37’s explanation for his inaccurate answer to this question on the OJC Questionnaire to be truthful and fully credits the same. Further, as it relates to the shooting incident involving his uncle and grandfather, the Court rules that Juror 37 inaccurately answered the question during voir dire; however, Juror 37 did not know that his answer was inaccurate, and he honestly believed that he answered the question accurately at the time. See Mitchell, 496 Mass. at 76 (“an inaccurate answer is not necessarily dishonest, as in cases of misunderstanding or memory lapse.”); Mitchell, 102 Mass. App. Ct. at 842 (ruling that “a misunderstanding of the scope or meaning of
 
                                                            -29-
 
the question . . . [is one] example[] of [a] reason[] why a particular nondisclosure — even if material — is benign in the sense that it does not reveal juror bias.”).
ii. Juror 37 Did Not Dishonestly Answer Questions 40 And 41 Of The Case Specific Questionnaire With Respect To The Shooting Incident Involving His Uncle And Grandfather
            There is no dispute that Questions 40 and 41 on the Case Specific Questionnaire, which asked whether someone close to the juror had been accused of committing or had been the victim of a violent crime, were “‘material question[s] on voir dire.’”[24] Mitchell, 496 Mass. at 75. Thus, the central issue the Court must consider is whether, in light of the information learned during the Evidentiary Hearing about the shooting incident involving Juror 37’s uncle and grandfather, he “failed to answer honestly,” Amirault, 399 Mass. at 625, when he answered “no” to Questions 40 and 41 on the Case Specific Questionnaire.
            According to Brito, the evidence that Juror 37’s “no” answers to Questions 40 and 41 on the Case Specific Questionnaire were dishonest is Juror 37’s characterization of the shooting incident during the Evidentiary Hearing as not being a violent crime. Brito contends that Juror 37’s characterization is implausible and absurd given that his uncle shot his grandfather at close range in the neck.
            Further, Brito points to Juror 37’s testimony during the Evidentiary Hearing about the nature of his uncle’s mental illness, which Brito contends Juror 37 deceptively minimized. At the Evidentiary Hearing, Juror 37 explained that his uncle had suffered from a “mood disorder” during the shooting and he denied that his uncle ever suffered
 
--------------------------------------------
 
[24] “‘For this purpose, a voir dire question is material if a response to it has a natural tendency to influence, or is capable of influencing, the judge’s impartiality determination.’” Mitchell, 102 Mass. App. Ct. at 842 - 843.
 
                                                            -20-
 
from psychosis, which he understood to mean “like seeing things or hearing things, . . . being directed by other entities than oneself.” Evid. Hr’g Tr., p. 102. Brito also argues that this testimony contradicted Juror 37’s testimony during voir dire, where he stated that his uncle “was obsessive compulsive, manic depressive, schizophrenic, he had a number of issues,” Ex. 1, Voir Dire Tr., p. 11, and where Juror 37 answered affirmatively when asked by defense counsel whether his uncle had “psychotic thoughts.” Id. at p. 19. Brito also points out that two jurors reported that Juror 37 stated during deliberations that the shooting occurred “during a schizophrenic break,” according to Juror 11 (Ex. B), and “during a psychotic break,” according to Juror 15 (Ex. D).
            As to Juror 37’s “no” answers to Questions 40 and 41 on the Case Specific Questionnaire, “the crucial inquiry is whether the juror’s answer[s] w[ere] honest; that is, whether the juror was aware that the answer[s] w[ere] false.” Amirault, 399 Mass. at 626 (emphasis added). “An answer is dishonest if the juror knowingly gave an inaccurate answer — that is, if the juror was aware that h[is] answer was false when []he gave it.” Mitchell, 496 Mass. at 75. Stated differently, a juror “‘dishonestly answered a material question on voir dire,’” id., when the juror knew at the time he answered that his answer was inaccurate.
            Determining whether Juror 37 “was aware that the answer[s] w[ere] false,’” Amirault, 399 Mass. at 626, requires the Court to examine Juror 37’s subjective intent and motive when inaccurately answering Questions 40 and 41 during voir dire. See Mitchell, 496 Mass. at 76 (“because the Amirault test implicates a juror’s subjective motives and biases, a judge’s ruling normally involves an evaluation of the juror’s credibility — a question of fact that is heavily dependent on assessing the juror’s
 
                                                            -31-
 
demeanor.”); Mitchell, 102 Mass. App. Ct. at 842 (ruling that “a misunderstanding of the scope or meaning of the question . . . [is one] example[] of [a] reason[] why a particular nondisclosure — even if material — is benign in the sense that it does not reveal juror bias.”); cf. Commonwealth v. Harrison, 368 Mass. 366, 375 – 376 (1975) (observing in dicta that “[a]ssuming, . . . the . . . proposition that a false statement by a juror at voir dire automatically . . . undermines the verdict, . . . [i]t would surely be required that the falsehood be not only unmistakable but material and knowing.”).
            Here, with these legal standards in mind, the Court rules that Juror 37 was not aware that his “no” answers to Questions 40 and 41 on the Case Specific Questionnaire “were false when made.” Amirault, 399 Mass. at 626. Based on the Court’s observations of Juror 37’s demeanor and body language during the Evidentiary Hearing, the Court believes and fully credits his explanation that he did not equate the shooting with being a violent “crime” because it was the product of his uncle’s mental illness, not an intent to harm. For reasons explained below, the Court finds that this explanation was what Juror 37 honestly believed when answering Questions 40 and 41 during voir dire. Accordingly, the Court rules that Juror 37 did not knowingly give inaccurate answers to Questions 40 and 41 on the Case Specific Questionnaire as they relate to the shooting incident involving his uncle and grandfather. Mitchell, 496 Mass. at 75.
            The Court agrees with the Commonwealth that, “Juror 37’s somewhat sophisticated legal explanation based on ‘intent’ is entirely consistent with his decades long training as a military officer.” Commonwealth’s Opposition, p. 10 (Paper No. 184). To be sure, Juror 37 was a Navy commanding officer who, while at sea, applied the Uniform Code of Military Justice while serving as “judge and jury.”
 
                                                            -32-
 
            What Brito sees as “malarky” and a dishonest splitting of legal hairs, the Court views as the product of Juror 37’s extensive training and experience as a Captain in the Navy. It also elucidates the lawyer-like, exacting, unemotional nature of Juror 37’s explanation of his thought process during the Evidentiary Hearing, when he explained why he inaccurately answered “no” to Questions 40 and 41. In fact, the Court recalls that Juror 37 exhibited the very same demeanor and thought process when answering questions posed by the Court and defense counsel during voir dire.
            The phraseology of Juror 37’s explanation during the Evidentiary Hearing that, “when [he] think[s] of a violent crime[, he] think[s] of intent” to harm was entirely consistent with the precise answers he gave during voir dire. See e.g., “I would say the probability is ten percent ….,” Ex. 1, Voir Dire Tr., p. 6; “… it was a direct correlation … with my duties as a Commanding Officer,” id. at p. 13; “… the two, I would say, were not correlated to one another, it was just the proximity of the event itself,” id. at pp. 17 – 18; “… I don’t think any more so than … any reasonable member of society would ….,” id. at p. 21; “… he was incarcerated for a short period of time,” id. at p. 73; “… so my uncle is a peripheral family member ….” Id. at p. 97.
            In fact, Juror 37’s exactitude was on full display during the Evidentiary Hearing. See e.g., “… they were cohabitating at the time,” Evid. Hr’g Tr., p. 70; “I did not consider what he [his uncle] did to be a violent crime, largely again because of our familial circumstances ….” I d. at p. 100; “None that I’m formally aware of ….” id. at p. 102; “I would say there was a direct correlation ….,” id. at p. 112. At bottom, as defense counsel and Juror 37 unabashedly agreed during voir dire, “Once a Commanding Officer, always a Commanding Officer.” Ex. 1, Voir Dire Tr., p. 16.
 
                                                            -33-
 
            The Court has no difficulty making these findings and rulings regarding the veracity of Juror 37’s explanation for why he did not disclose the shooting incident in response to Questions 40 and 41, notwithstanding that, as Brito points out, a juror reported that during deliberations, Juror 37 purportedly seemingly minimized the impact of mental illness on his uncle’s mens rea during the shooting, i.e., “[Juror 37] would repeat the story about his uncle shooting his grandfather, and tell us that even though he was schizophrenic his uncle knew what he was doing . . . ” Ex. B. This juror’s report stands in contrast to the reports of two other deliberating jurors who made no mention of this (Exs. A and D), one of whom implied that Juror 37 mentioned the shooting just once, “[o]n the first day of jury deliberations,” and did so in the context of telling them “that he had experience in his own family with mental illness.” Ex. D.[25], [26]
 
--------------------------------------------
 
[25] In fact, the information in the Anonymous Letter and the affidavits from the deliberating jurors concerning what Juror 37 may have said about the shooting incident is inconsistent and less than compelling. One juror reported that Juror 37 stated “that a family member had shot and killed another family member,” Ex. D (emphasis added), and another juror implied they heard of the shooting secondhand, i.e., “it came to our attention,” rather than directly from Juror 37.
Ex. A.
[26] After the judicial inquiry of Juror 37, Brito filed, inter alia, a Supplemental Memorandum In Support Of Further Juror Inquiry (Paper No. 176) that included contemporaneous news articles about the shooting incident involving Juror 37’s uncle. Brito argues in the Motion, as he did previously in the Supplemental Memorandum, that information gleaned from the articles casts further doubt on the veracity of Juror 37’s testimony. Leaving aside the propriety of news articles as a source, the Court disagrees that the articles cast doubt on Juror 37’s credibility. In fact, the news articles corroborate, rather than detract from, Juror 37’s testimony about the shooting incident. For example, like Juror 37’s testimony, the articles state that: his grandfather was shot without provocation, his grandfather walked to a neighbor's house after being shot, a 22 caliber handgun was used in the altercation, his grandparents publicly apologized to the community about the incident and thanked the police for their support, and his uncle suffered from mental illness (i.e., according to the articles, Juror 37’s uncle was seen after the incident seated in a restaurant in a disheveled state while muttering to a photograph of a woman). To the extent that the news articles provide additional details about the shooting incident that Juror 37 did not mention during the hearing, such as that the incident prompted a daylong manhunt, those details are not germane to the Court’s factfinding.
 
                                                            -34-
 
iii. Juror 37 Did Not Dishonestly Answer Questions During Voir Dire With Respect To His Father’s Multiple Arrests
            In the Motion, Brito argues in passing that Juror 37 also dishonesty answered the two questionnaires by failing to disclose that his father had been arrested multiple times. With respect to why he did not disclose his father’s multiple arrests when answering the OJC Questionnaire, Juror 37 testified credibly at the Evidentiary Hearing that these events happened long ago when he was a very young child, that shortly thereafter his father moved out and his parents divorced, and that he had been estranged from his father for a decade at the time he answered the questionnaires.
            As to this argument, the Court finds that Juror 37 did not know at the time that he inaccurately answered the OCJ Questionnaire by failing to disclose his father’s decades-old multiple arrests. Accordingly, the Court rules that Brito failed to show that Juror 37 “knowingly gave an inaccurate answer,” Mitchell, 496 Mass. at 75, on the questionnaires or that Juror 37 lacked impartiality because of the omission. See e.g. Amirault, 399 Mass. at 626 (finding no error where judge found after inquiry that juror’s failure to disclose they were victim of sexual assault was because “the juror had forgotten about the incident.”); Commonwealth v. Grant, 391 Mass. 645, 653 (1984) (affirming denial of motion for new trial in sexual assault case where jurors were asked during empanelment if they were conscious of any bias or prejudice, and juror failed to disclose her daughter had been raped ten years before trial; during judicial inquiry “[t]he juror responded that at that time she did not think about the incident involving her daughter . . . ”).[27]
 
--------------------------------------------
 
[27] To be clear, during the Evidentiary Hearing, neither party requested that the Court ask Juror 37 why, during voir dire, he failed to disclose that his mother was a crime victim when answering the OJC Questionnaire, and the Court did not do so. Nevertheless, it was not clear to the Court
 
                                                            -35-
 
C. In Addition, Brito Has Not Shown That Juror 37 Was Actually Biased Or Impliedly Biased
            Because the Court has ruled that Brito has failed to show that Juror 37 “‘dishonestly answered a material question on voir dire,’” Mitchell, 496 Mass. at 74 - 75, it need not reach the issue of whether Brito proved Juror 37 was biased. See id. (“If the juror’s answer to a material question was dishonest, the defendant must then demonstrate . . . that the juror was not impartial — i.e., that the juror was biased.”) (emphasis added); Murphy, 86 Mass. App. Ct. at 126 (“If the judge finds that the juror answered voir dire questions mistakenly, but honestly, the analysis as to actual bias ends, and the judge must find the juror impartial.”); Commonwealth v. Cambra, 2010 Mass. App. Unpub. LEXIS 1445 at *4 (2010) (“if [judge] finds that the juror answered voir dire questioning mistakenly, but honestly, then his analysis as to actual bias ends and he must find the juror impartial.”). Nevertheless, the Court will address this issue for the sake of completeness of the record on appeal.
            “A defendant may [show that a juror who dishonestly answered a material question during voir dire was biased] by demonstrating that the juror did, in fact, harbor actual bias against him, or by demonstrating that the surrounding factual circumstances are otherwise so extreme that the juror’s bias can be presumed as a matter of law.” Mitchell, 496 Mass. at 75 (citations omitted). Stated differently, “‘[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias
 
--------------------------------------------
 
whether Juror 37’s father had been arrested for victimizing his mother or for something his father did during an encounter with responding officers. See Evid. Hr’g Tr., pp. 68 – 69. (“there were a number of instances … where he had become … very angry … and my mother would call the local police authorities and they would have to come to the house and restrain him and remove him.”).
 
                                                            -36-
 
conclusively presumed as matter of law.’” Commonwealth v. Gonsalves, 96 Mass. App. Ct. 29, 32 (2019).
I. Brito Has Failed To Prove That Juror 37 Was Actually Biased Against Him
            “In making th[e] assessment [of whether a defendant shows actual bias], judges must remain cognizant that ‘[t]he motives for concealing information may vary, but only those reasons that affect a juror’s impartiality can truly be said to affect the fairness of a trial.’” Mitchell, 496 Mass. at 77.
            Here, pointing to, inter alia, comments Juror 37 allegedly made during deliberations, Brito argues that Juror 37 dishonestly failed to disclose the shooting incident involving his uncle and grandfather because he wanted to serve as a trial juror so that he could ensure that Brito “did not get away with it” due to mental illness. However, the idea of Juror 37 having nefarious reasons to want to serve as a trial juror in this case ignores two significant facts that arose during voir dire, which demonstrate that Juror 37 was not motivated to deceive the Court by a desire to be seated on the jury because of the subject matter of the case (or any other reason).
            First, based on the Juror 37’s demeanor, body language and statements he made during voir dire, the Court believed, at the time, that Juror 37 did not want to serve as a trial juror. The Court recalls that, during voir dire, Juror 37 attempted to be struck for hardship reasons due to a scheduling conflict with his duties as a youth baseball coach and the potential for work-related emergencies. Second, during the Evidentiary Hearing, it was clear to the Court that Juror 37 had a significant amount of empathy, understanding, and compassion for his uncle and others who suffer from mental illness.
 
                                                            -37-
 
            When viewing the credible evidence in its entirety, the Court has little difficulty in finding that Juror 37 harbored no actual bias against Brito, in particular, or men that commit violent or sexual crimes who “blame” it on mental illness, in general. In sum, the evidence reflects that Juror 37 was a fair and impartial juror when selected and remained so until he was discharged.
ii. Brito Has Failed To Prove Implied Bias
            In the Motion, Brito argues that Juror 37’s bias is implied, as a matter of law, because it was highly unlikely that Juror 37 could be impartial in his deliberations because of “the potential for substantial emotional involvement” due to the similarities between the facts of the case, and his uncle’s history of mental illness and the shooting incident. The Court does not agree.
            “Bias will be presumed only in ‘exceptional circumstances,’ based on the unique facts of a case.” Mitchell, 496 Mass. at 75 (citation omitted). “A defendant may [show bias] . . . by demonstrating that the surrounding factual circumstances are otherwise so extreme that the juror's bias can be presumed as a matter of law.” Id. (citations omitted).
            The SJC “ha[s] suggested a number of scenarios that may rise to such a level.” Id. (citation omitted). In particular, the SJC has stated:
We have recognized certain extreme circumstances where implied bias could be found: (1) where “it is disclosed that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction”; (2) in “a case where the trials of codefendants are severed and an individual observes the first trial and sits as a juror in the second trial”; and (3) where “a juror who has
 
                                                            -38-
 
been the victim of a similar crime and has consciously concealed that fact from the parties or the court.”
Commonwealth v. Mattier (No. 2), 474 Mass. 261, 275 (2016) (quotations and citations omitted); s ee e.g., Amirault, 399 Mass. at 624 (observing that, in Smith v. Phillips, 455 U.S. 209, 217 (1982), “the Supreme Court refused to impute bias to a juror who, during the trial, submitted an employment application to the prosecutor’s office.”); Gonsalves, 96 Mass. App. Ct. at 32 (“Bias is ‘conclusively presumed’ — i.e., implied — when, among other things, a juror has a particular connection to the case, including when ‘the juror is an actual employee of the prosecuting agency.’”); Murphy, 86 Mass. App. Ct. at 126 (ruling case was not “one of those exceptional situations where, because of the relationship between the juror and the witness, bias can be implied as a matter of law.”); Cambra, 2010 Mass. App. Unpub. LEXIS 1445, **9-11 (granting new trial and holding that failure of juror to disclose that her son had been victimized by the defendant twelve years earlier demonstrated implied bias as a matter of law).
            Brito’s reliance on United States v. Gonzalez, 214 F.3d 1109 (9th Cir. 2000), for the proposition that Juror 37’s bias must be implied as a matter of law is unpersuasive. In Gonzalez, the defendant was charged with cocaine distribution and related offenses. Id. at 1110. During empanelment, the trial judge denied the defendant’s challenge of “juror Camacho” for cause under the following circumstances:
Camacho was married to and lived with someone who both bought and sold cocaine on a regular basis, bore that person a child, and then divorced him on account of his involvement with drugs, all within approximately five years of sitting on the jury. The activities of Camacho’s husband which led to her divorce and the break-up of her family resembled the fact pattern at issue in the case in which she served - a case in which, if the government’s charges were true, the
 
                                                            -39-
 
defendant had endangered his family's safety and security in order to traffic in cocaine. Id. at 1114.
            In ruling that the trial court erred in denying the defendant’s cause challenge, the Ninth Circuit held that:
When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will “lay aside” her biases or her prejudicial personal experiences and render a fair and impartial verdict. Given Camacho’s responses to the court’s questions and the similarity between her traumatic familial experience and the defendant’s alleged conduct, we conclude that the failure to excuse her for cause under either an express or implied bias theory requires reversal.
Id. (emphasis added).
            In Gonzalez, unlike here, during voir dire “Camacho was asked three times whether she could be fair, and each time she responded equivocally. Not once did she affirmatively state that she could or would serve fairly or impartially.” Id. (original emphasis). Moreover, in contrast to the juror in Gonzalez, when the Court asked Juror 37 three different times during voir dire whether he could weigh certain evidence fairly, and be fair and impartial, he stated, without hesitation, “yes.”
            At bottom, Brito has failed to show “exceptional circumstances” warranting a presumption that Juror 37 was bias. Mitchell, 496 Mass. at 75.
iii. Juror 37 Was Not Biased And Did Not Display Any Intent To Conceal Any Bias
            In sum, the Court rules that Juror 37 neither displayed any intent or motive to conceal bias nor was actually or implicitly biased against Brito.
 
                                                            -40-
 
III. CONCLUSION
            For all the reasons set forth above, the Court concludes that Juror 37 did not dishonestly answer questions during voir dire and was not biased against Brito or otherwise. Accordingly, the Motion must be DENIED.[28]
ORDER
            For the above reasons, it is HEREBY ORDERED that Defendant’s Post-Verdict Motion To Vacate Verdict (Paper No. 180) is DENIED.
/s/Jeffrey T. Karp
Associate Justice, Superior Court 
July 3, 2025
 
--------------------------------------------
 
[28] Pointing to the averment in Juror 11’s affidavit that Juror 37 said repeatedly during deliberations that his uncle knew what he was doing during the shooting even though he was schizophrenic, etc., Brito “presses his argument that [this] constituted extraneous influence,” Motion, p. 52 (Paper No. 180), which “shifts [the burden] to the Commonwealth to show beyond a reasonable doubt that [Brito] was not prejudiced by the extraneous matter.” Fidler, 377 Mass. at 201. Nevertheless, the Court stands by its previous ruling that this information is not an actionable extraneous matter or influence under our case law. Brito’s “argument conflates extraneous information with the knowledge and experience that individuals bring with them when they sit as jurors . . . ‘[E]xtraneous information in this context refers to ‘specific facts not mentioned at trial concerning one of the parties or the matter in litigation.’” Commonwealth v. Watt, 484 Mass. 742, 758 – 759 (2020) (citations and quotation omitted). Furthermore, even if Brito’s is correct in saying that Juror 37’s statements during deliberations were an actionable extraneous influence or matter, he still must prove that Juror 37 harbored actual or implied bias, something he has failed to do.